CASE 6—PETITION EQUITY—JUNE 17.

# Griswold vs. Hepburn.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. The distinctive difference between the question whether an act of Congress is in violation of the Federal Constitution, and whether an act of the State Legislature is in conflict with the State Constitution, is, that, in the former case, the power to enact the law in question must be shown to have been delegated; in the latter, it must be shown that its passage is prohibited.

Griswold vs. Hepburn.

2. Express power to attain a designated end, or fulfill a specific trust, necessarily implies the subsidiary power to employ the means necessary for effectuating the contemplated end, excepting only so far as a particular means may be inconsistent with the charter of authority.

3. The declaration that Congress shall have power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers," neither enlarges nor contracts the specific powers expressly granted, but only certifies and defines the natural and necessary sphere of implied powers, which are as much delegated as the express powers, to which they are subservient—as means to ends.

4. The word "*necessary*" is not equivalent to "*indispensable;*" but all means relating to the end of any express power, and conducive to the execution of it, are, in the constitutional sense, "*necessary means.*"

5. The true test of implied power is, whether a preferred means is adapted to the end of an express power, and is also unprohibited, or, in other words, is congenial with the spirit and purpose of the Constitution.

6. "To coin money," means to mould into form a metallic substance of intrinsic value, and stamp on it its legal value, so as to encourage and facilitate its free circulation, and assure stability in the currency.

7. "Currency" is not necessarily money. Whatever circulates conventionally on its own credit, as a medium of exchange, whether it be bank notes, bills of exchange, or government securities, being thus, practically, current, is properly currency.

8. Congress and the States are alike prohibited from making anything but coined money a legal tender.

9. The power to borrow money was legally exercised by the issue of treasury notes.

10. To make treasury notes a legal tender in satisfaction of a contract for money, deriving its obligation from State laws, unconstitutionally impairs the obligation of the contract.

11. The law, under the sanction and faith of which a contract is made and to be performed, defines its obligation, and any legislative act that makes the right less valuable and available, impairs the obligation of the contract.

12. Congress has no power to pass laws impairing the obligation of contracts, beyond the expressly granted power over bankruptcy.

13. So much of the congressional statute of the 25th February, 1862, as declares United States treasury notes to be money, and a legal tender in payment of debt$_S$ on private contract, is clearly unconstitutional.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT—JUDGE WILLIAMS DISSENTING:

The only question involved in this appeal is the constitutional validity of so much of the congressional statute of the 25th of February, 1862, as enacted that "*United States treasury notes* (authorized by it) *shall also be lawful money, and a legal*

*tender in payment of all debts, public and private, in the United States.*"

A solution of the grave and apparently difficult problem now, for the first time, presented for the consideration of this court, has been attempted by several of the State tribunals, whose opinions have been various in reasons, and, to some extent, conflicting in conclusion. And, as the great controversy, thus far presenting such manifold phases, can be finally concluded only by the judicial organ of all the people of all the States, and as, therefore, no transient opinion of the appellate court of Kentucky can ultimately have any authoritative effect, we had hoped that we might be spared the peculiar responsibilities of announcing our own judicial conclusion on a subject as important to constitutional liberty and union as any ever presented to the American judiciary. But neither duty nor propriety will permit evasion or longer delay. And now, in reluctantly approaching a question of so much magnitude in principle and so momentous in its bearing on the consistency, stability, and practical supremacy of the Federal Constitution, our only fear is, that we may not be able to divest our judicial minds of all extraneous influence, and, with perfect impartiality, looking to the Constitution and its historic interpretation alone, expound it truly for the welfare of the country and the security of posterity.

The political mechanism of the United States is a simple dualism, consisting of separate State governments for all local concerns, and a common government for all national affairs.

The Constitution of the United States defines the spheres of each of these forms of government; and, in it, the people of the States, who, as pre-existing sovereignties, made it, reserved to themselves all powers not transferred by it, and declared that, in the ultimate sense, it shall be the supreme law of the land. As thus defined, each State government possesses the inherent sovereignty of its local constituency, modified by the delegation of all national power to the general government, and by the limitations of their common Constitution. Our unique system—Federo-national—is, there-

fore, appropriately styled "*Imperium in Imperio,*" and theoretically resembles the simplicity and harmony of the solar system, whose separate planets revolve in their own distinct orbits around their own central sun.

This new and beautiful organism is yet in the course of practical development, which may soon prove whether its fundamental *equilibrium* of local and national power is in most danger of disturbance from the centrifugal tendencies of the States, or the centripetal attractions of the central government. To preserve the constitutional balance, hitherto deemed indispensable to union and security, each government *must,* as their organic law contemplates and enjoins, confine its action within its own allotted sphere, and never cross the boundary line of their respective powers. Their common judiciary is their organic guardian of that sacred line, and no human tribunal was ever endowed with a higher power, or intrusted with a more responsible duty. Tranquility and fraternity demand that the general government especially should carefully abstain from the assumption of undelegated power, and the exercise of even a doubtful power which might jeopard the reserved rights of the States. And, consequently, as it is the duty of the Judiciary to pronounce the law in every judicial case, and as no act of Congress, not authorized by the Constitution, can be law, fidelity to official trust requires every court to adjudge any such act unconstitutional and void, and even to withhold its sanction and co-operation in every obscure case, unless it can see some satisfactory reason for admitting the constitutionality of the questionable act. When twilight vexatiously obscures the boundary between national and State power, there may be imminent danger, and especially in seasons of tempting disturbances by war or otherwise, of encroachment on the reserved rights of the States, whereby our Federal system might be dislocated, and its harmony, so essential to union, might be destroyed. To prevent such a national catastrophe, the judiciary *should* be slow to enforce an adventurous act pregnant with so much peril, and of such doubtful authority. But the same reason being inapplicable to State

legislation of doubtful compatibility with a State Constitu-
tion, proper deference to the legislative department should
preponderate in favor of the constitutionality of its acts, and
require the judicial department to recognize them as laws,
unless it shall be *clearly* satisfied that they are not.

Whenever a jurist inquires whether a State statute is con-
sistent with the State Constitution, he looks into that Consti-
tution, not for a grant, but only for some limitation of the
power inherent in the people's legislative organ so far as not
forbidden by their organic law.

But, as Congress derives its power from grants by the
people of pre-existent State sovereignties, an enlightened
inquirer into the constitutionality of any of its acts, looks
only for a delegation of power by the Federal Constitution;
for that Constitution expressly declares that all power not
delegated by it, is reserved to the States or to the people,   In
this class of cases, therefore, he who asserts the power holds
the affirmative, and, unless he " maintains it," the controvert-
ed act should not be enforced as law by the judiciary.   On
the contrary, the party affirming that a legislative act of a
State is prohibited by the State Constitution, must prove it,
and, unless the proof be clear, the contested act must be
admitted to be law.   The distinctive difference between the
two classes of cases is, that, in the former, the power must be
shown to have been delegated; but, in the latter, it must
appear to have been prohibited.

And, in this case, therefore, the power to pass the tender
act must satisfactorily appear to have been delegated before
the judiciary should recognize and enforce it.

But express power to attain a designated end or fulfill a
specific trust, necessarily implies the subsidiary power to
employ the means necessary for effectuating the contemplated
end, excepting only so far as a particular mean may be incon-
sistent with the charter of authority.   And this clear principle
of philosophy—applicable to political as well as to personal
trusts—is expressly recognized and confirmed by that provi-
sion of the Federal Constitution which, immediately succeed-
ing the enumerated powers, declares that Congress shall have

power " *to make all laws which shall be necessary and proper for carrying into execution the foregoing power.*"

To avoid controversy or doubt this clause was adopted, not as a grant, but only as an authoritative recognition of the necessary existence and true range of *incidental* powers too numerous and various for specific enumeration; and, consequently, this fundamental declaration neither enlarges nor contracts the specific powers expressly granted, but only certifies and defines the natural and necessary sphere of implied powers, which are as much delegated as the express powers to which they are properly subservient—as means to ends. These means must be both " necessary *and* proper." And what are such means may, in nearly all instances, be freed from rational doubt by a logical test consistently applied.

Indispensable is neither the popular nor the constitutional sense of the simple word " necessary." No one mean can be indispensable if any other mean could attain the same end; and therefore there could be no implied power in any case if none but indispensable means were constitutional. But all means relating to the end of any express power, and conducive to the execution of it, are, in the constitutional sense, " necessary means." And, among all such adaptable means, Congress may choose any one which, in the exercise of a sound discretion, it may deem most befitting. Over that choice—whether wise or unwise, politic or impolitic—the judiciary has no jurisdiction. Its revisory cognizance is confined to questions of power, and can never, without usurpation, be extended to questions of policy or expediency. And while, in this case, this court cannot consider the expediency or inexpediency of the tender act, it may and must decide whether it was an unprohibited mean adapted to the end of any express power.

" Proper" is neither synonymous with " necessary," nor a superfluous addition to it, as it would be if it import merely fitting, or appropriate, or adaptable, which is the meaning of " necessary." But, as a chosen mean may be prohibited by the letter or the spirit and aim of the Constitution, however,

adaptable, and, in that sense, "necessary," it cannot be "proper," and, therefore, it must be adjudged unconstitutional, as being thus prohibited. The true test of implied power is, whether a preferred mean is adapted to the end of an express power, and is also unprohibited, or, in other words, is congenial with the spirit and purpose of the Constitution. This test constructively excludes from "necessary and proper means" all power that is intrinsically substantive and independent, the non-delegation of which implied that the States and people intended to reserve it to themselves, or, in any event, to withhold it from Congress.

The incorporation of the national bank of 1816 raised this very question, in the great case of *McCullough vs. Maryland*, in which the supreme court of the United States decided that the bank incorporation was a necessary and proper mean to the end of safely keeping and transmitting the public money; and Chief Justice Marshall, considering the power to incorporate as not substantive and independent, but necessarily a mean only to the end of some such express powers, said: " The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war, or levying taxes, or regulating commerce, a great substantive and independent power, *which cannot be implied as incidental to other powers or used as means of executing them*." All such power is itself an *end*, and not a *mean* to the end of any express power, and therefore cannot be implied.

And truly, had no express power been granted to declare war, levy taxes, and regulate commerce, there could have been no implied power to do either of those things, but each of these independent powers would have been undoubtedly retained by the States, and, impliedly, forbidden to Congress. And what can be more substantive and independent than the most vital of all commercial powers—the power to make and regulate a nation's money? This power is everywhere treated as one of the highest and most essential attributes of national sovereignty, and could not be admitted as an implied power in Congress, any more than the power to declare war or regulate commerce could be so held to be in the absence of any

express power. And the power over tender is equally substantive, *for it may control and nullify the other*.

The test of national power, as thus substantially defined, is established by reason, and still more authoritatively by the undeviating concurrence of the judiciary, both State and national; and it is the only safe or consistent criterion for an uniform and a stable construction of our national Constitution. Without its guide the charter of the Union, like a rudderless ship, would fluctuate between the *Scylla* of strict, and the Charybdis of latitudinarian, interpretation; and then, its essential end of certainty and uniformity being frustrated, it would become the victim of circumstances, and be often moulded by passion or policy. Expediency and power are too often confounded as synonymous. They are widely different. Expediency is uncertain—the Constitution certain. Expediency changes—the Constitution never. Expediency bends to circumstances—the Constitution, exalted high above them by the people, never bows to men or times.

Constitutional discretion cannot do whatever may promote " the general welfare." Express power to promote the general welfare has not, *eo nomine*, been given; such specific power would have devoured all the other powers and resolved the national government into despotic anarchy.

The declared object of the express power to levy taxes was " to provide for the common defense and general welfare," which can only be done by the exercise of the delegated powers. The general welfare is not a power, but only the purpose of the constitutional exercise of the powers granted.

The fact that a measure may promote the general welfare neither proves, nor, *per se*, tends to prove, that Congress may enact it as law.

Uniformity in the law of wills, conveyances, and other contracts, in all the States, might, and probably would, tend to the general welfare; but the States chose to retain, each for herself, the power to regulate that matter in their own way. So, too, some of our wisest patriots think that the general welfare would be promoted by the abolishment of slavery; but surely Congress has no legislative power over that domes-

tic institution in the States. Nor does the impolicy of a legislative act prove its unconstitutionality. Many enactments have been unwise, and nevertheless constitutional. Within the limits of the Constitution legislative discretion is law; but, beyond that conservative boundary, it is a lawless *brutum fulmen*, totally destitute of authority.

The people of the States adopted their federal charter as moulded in such form and animated with such a spirit as they thought best for securing their common liberty and progress, and for saving themselves and posterity from the anarchy of vagrant legislation on the capricious plea of mere expediency and the general welfare; and, to secure that great end, the test just indicated must, always, inflexibly guide legislators and judges as the best and only safe cynosure of constructive power. That pole star will never decoy nor deceive. Guided by the chaste light of that lone star, we will proceed to analyze the power assumed to pass the legal tender act of February, 1862.

As every contract and every judgment for money will be legally discharged by the payment of money, just as every contract and judgment for any other thing will be discharged by a delivery of the thing itself, therefore, *proprio vi*, money will necessarily be a lawful tender, without any legislative enactment for legalizing it as such; consequently, if the currency called "United States treasury notes" can be legally held to be "money," as declared by the act of February, 1862, the further declaration, that it should be a legal tender in contracts and judgments for money, was an act of·supererogation; for being money makes them a legal tender without the superfluous enactment to the same effect; and, unless they constitute money, they are not a legal tender for money due, and no act of Congress can make them so, without impairing the obligation of contracts, and otherwise assuming powers never delegated; and, seeming conscious that nothing but money could be made a tender for a debt due in money, *Congress* saw fit, as a necessary preliminary, to declare *United States treasury notes "to be* money." Whether in the technical and constitutional sense of money that act made them money, *is the radical* question.

Money being the universal standard of value and measure of exchange, foreign and domestic, to make and regulate money is, as before suggested, one of the highest and most essential attributes of national sovereignty; and the harmony and prosperity of the *United States* especially require that the legal currency should be the same in all the States, and be made as uniform and stable as possible. Being, therefore, a national concern of vital interest, the national will should exclusively control the money of the United States. The people of the old Confederate States, having learned this wholesome lesson by an afflictive experience, unanimously surrendered all State power over the currency, and magnanimously transferred it to the national Congress, to a prudently circumscribed extent, by the following provisions in the Federal Constitution they adopted: "*Congress shall have power to coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures.*" "*No State shall coin money, emit bills of credit, make anything but gold and silver coin a tender in payment of debts.*"

If, as some few persons have argued, " to coin money " is a *carte blanche* allowing Congress to make or to declare anything money it may choose for the national currency, then there is express power to issue treasury notes, and declare them to be money, and, as a necessary sequence, a lawful tender. But this comprehensive construction is, in our judgment, unauthorized by the letter, and irreconcilable with the motives and the purpose of the quoted clauses.` " To coin money " clearly means to mould into form a metallic substance of intrinsic value, and stamp on it its legal value, so as to encourage and facilitate its free circulation and assure stability in the currency. The thing so coined is itself money, *ipse loquitur;* but a treasury note is only a promise to pay money, and, at the utmost, can only be, like a *bank bill* or a bill of exchange, a representative of money; and it is even less a representative of money than such bills; for, while these must be paid in money, the treasury notes are payable in other promises in the same form. This literal import of the words " to coin money " is persuasively fortified by the accompany-

ing power to regulate the value " of foreign *coin*." When the Constitution was adopted, as even yet, all foreign money was metallic coin; and therefore the power to regulate such coin was constructively restricted to coined metal, and did not include notes on the Bank of England, or consols, or other government bonds or securities. The conclusion is plain, and apparently inevitable, that the power to coin money was intended to mean to coin metal as the money of the United States; and the curse of the paper currency of the revolution, the fiscal ruin of the confederation, and the history of the adoption of the Federal Constitution, conduce strongly to prove that, when the people who adopted it delegated to Congress exclusive power ." to coin money," they intended that nothing else than metallic coin should be money, or be a legal tender, *in invitum*, as *money;* and it is almost certain that they did not intend to confer on Congress any more or other power to make money, or declare any thing else to be money, or *compel* the circulation of any thing else as money.

During the revolutionary war with England each State had its own peculiar currency, consisting chiefly of its own bills of credit, which depreciated so rapidly as soon to become worthless; and the currency of no one State would circulate in any other State or elsewhere. Continental bills, issued by the confederation, also became so valueless as to frustrate regular commerce, bankrupt citizens, and produce general embarrassment and universal vexation and distress in all the States.

This paper currency excluded from circulation all coined money, as such currency always has done and always will do. Gold and silver coin possesses an intrinsic value nearly equal to its denomination, and is uniform throughout the commercial world. To insure its universal circulation without discount, no tender law is ever necessary; and, not depending on the credit of corporations or governments, it is not subject to the injurious fluctuations of a paper medium of no intrinsic value, which, upheld only by an uncertain and vibrating public opinion, cannot operate as a safe and uniform standard of value at home nor abroad. And *Thiers*, in the 2*d vol.* of his *French Revolution*, says this was so during the disturbing prevalence

of *Assignats* and *Mandats*, which proved so destructive in France. Even England, with her strong backbone of financial credit, burdened with the heavy pressure of the French revolution, which necessitated a compulsive suspension of specie payments by her great bank, never declared its notes to be money; and her omnipotent parliament, though unrestrained by the American check of fundamental law circumscribing its power, were too statesmanlike and self-denying to make them a legal tender; nor, under all its besetting temptations, did the Congress of the confederation, with express power to emit bills of credit, ever issue them as money or a legal tender. These, like multitudes of other historic examples, illustrate the great practical difference between coin and paper money and credit, as fully tested by the experience of mankind; and in no portion of the world or period of its history was this probation ever more conclusively effectual than in our own country for many years of sore trial preceding the adoption of the Federal Constitution. When this Constitution was adopted, a large majority of the people were inflexibly opposed to all "paper money," and looked to the precious metal as the only hope of an equable and universally accredited currency.

The debates in the convention echo that sentiment, and its offspring was coined money, as established by the Constitution. The *articles of confederation* gave to its Congress power "to coin money and emit bills of credit." The same power was transcribed into a draft of the present Constitution; but, on the motion of Governeur Morris, the power to "emit bills of credit" was stricken out by a large majority, and the power "to coin money" was left, as it now stands, alone. The following extracts from the debate on that motion will show the motive for that decision: Mr. Morris said, that "if the United States had credit, such bills would be unnecessary; if they had not, unjust and useless." Mr. Madison, afterwards President of the United States, said: "Will it not be sufficient to prohibit the making them a tender? This will remove the temptation to emit them with unjust views; and promissory notes, *in that shape*, may, in some emergencies, be best." Mr. Gor-

ham said he was "for striking out without any provision. If the words stand, they may lead to the measure."

Mr. Mason, expressing doubts and unwillingness "to tie the hands of Congress," said: "Congress (he thought) *would not have the power unless it were expressed.*"

Mr. Goram again said: "The power (of emitting bills), *so far as it will be necessary* or safe, is involved in that of borrowing money;" that is, to issue Government notes, but not to force their circulation by declaring them *money*, nor making them a legal tender.

Mr. Ellsworth (afterwards Chief Justice of the United States) said he "thought this a favorable moment to shut and bar the door against *paper money.* The mischiefs of the various experiments which had been made were now fresh on the public mind, and had excited the disgust of all the respectable part of America. By withholding the power from the new government, more friends of influence would be gained to it than by almost anything else. *Paper money* can, in no case, be necessary. Give the government credit, and other resources will offer. The power may do harm—never good."

Mr. Wilson, afterwards a judge of the supreme court of the United States, said that "the striking out would have a most salutary influence on the credit of the United States. The expedient will never succeed whilst its mischiefs are remembered, and, as long as it can be resorted to, it will be a bar to other resources."

Mr. Butler, suggesting that paper currency was not a legal tender anywhere in Europe, expressed anxiety for denying to Congress the power to declare it money, or make it a legal tender.

Mr. Read said: "Unless the power to emit bills for currency should be stricken out, it would be as alarming as the 'Beast in revelation.'"

Mr. Langdon declared that he would rather reject the whole plan than retain the three words, "and emit bills."

On the sentiments, and for the purposes thus indicated, the proposed power to emit bills of credit was repudiated by the

vote of nine States, against the vote of New Jersey and Maryland.

These contemporaneous facts are recorded in the 3d vol. of the Madison Papers, pp. 1343–4–5–6; and the debate on both sides shows, that, while a minority of the convention were in favor of vesting Congress with the supplemental power to issue bills *for conventional circulation* merely, *not a single member, except perhaps Mr. Mercer, seemed willing to intrust Congress with power to make that currency money, or a legal tender.* And, in a note appended to the 1346th page, Mr. Madison said that he acquiesced in the vote of the majority, because he presumed that " withholding the express power ' to emit bills of credit' would not disable the government from the use of public notes *as far as they could be safe and proper*, and would only *cut off the pretext* for a paper currency, and *particularly for making the bills a tender*."

" Currency " is not necessarily " money;" whatever circulates conventionally on its own credit as a medium of exchange, whether it be bank notes, bills of exchange, or government securities, being thus practically current, is properly " currency." But such currency, *merely spontaneous*, is not " money," which is the *legal* medium of exchange, and the only true standard of value. And this distinction between money and currency seems to have been understood by the whole convention which proposed the Constitution to the States for their ratification, the minority proposing to vest Congress with power to supply a paper currency only as a voluntary medium of exchange, leaving the constitutional coin as the only money, and only legal tender. And the ratifying State conventions seemed to contemplate the subject in the same light. The denial of the power to emit bills of credit does not appear to have been even objected to in any State convention. And history indicates that, had the Constitution granted that power, it would have been rejected by a majority of the States.

The inevitable conclusion from this extraneous but incidental and illustrative evidence, is, that the people, in adopt-

Griswold vs. Hepburn.

ting the Constitution, intended, with singular unanimity, to withhold from Congress, as well as from their own State Legislatures, the power to issue "*paper money*," or make anything else than *coined money* a legal tender. But the face of the Constitution drives inevitably to the same conclusion. The power to *coin* "money" is the only money-making pow delegated to Congress. Without express grant, Congress uld have had no power whatever over money. The only grant made is specific and well-defined, and beyond this Congress can have no express authority to go; and any attempt to go further would defeat the great purpose of defining and establishing coin as the money of the United States; and, therefore, and also because no such substantive power could be implied, Congress can have no implied power to make any thing else than coin *money*. Knowing that Congress could have no power over money except so far as delegated, the people chose, for national reasons, to delegate the single power "to coin money," *and there stopped*. And anxious to maintain coin as the only *money*, they tied the hands of their own Legislatures, and not only abandoned all their inherent power over money, except a qualified power over the legal tender, expressly restricted to gold and silver, but, for the same immutable reason, withheld from Congress any power over tender. That renunciation of their absolute power and reservation of a qualified power over tender, is *itself*, and alone, sufficient proof of a constructive and purposed denial to Congress of any power over it; for, as such power in Congress would necessarily be exclusive and paramount, the exercise of it would supersede or control all State power over tender, and, therefore, the qualified prohibition against the States would have been superfluous, idle, and inconsistent. But that prohibition, as qualified, is an acknowledgment of the power of the States, and the only object of it was to limit that retained power so as to prevent any legislative interference with the only money permitted to be made a tender in the United States. Consequently the people of the States, by retaining power over tender and granting none to Congress, constructively denied to Congress any implied power on that

Griswold vs. Hepburn.

subject. And this conclusively fortifies the deduction from other reasons that they intended that nothing but coin should ever be made money, or a legal tender as such.

And if this be not true, why did they adopt the quoted prohibitions on their own power, and why grant the specific power only? If they intended that Congress should have any more power over money, why did they not make the grant more comprehensive? only and certainly because they in ended that nothing but coin should ever be made legal money or tender either by their own Legislatures or by Cc̄ gress. And, to prevent a frustration of their great p̄ ,ose as to an uniform money standard of value, they inten d that Congress should not, any more than their own Legislatures, have any implied power over money or tender for money.

The States abandoned their power to make any thing but gold and silver a tender in payment of debts contracted even under, and therefore regulated by, their own local laws, because the exercise of that abdicated power might defeat the national purpose of maintaining the currency and stability of the only legal money. And why should Congress claim such an undelegated and suicidal power? And whence does it derive it? Not from express grant, for that is constructively negatived, nor from implication, for such control over money and contracts can never be implied, even if there be no constructive negative of it; and if it possess any such power, its implied powers are unlimited by any constitutional test uniformly applicable. But it is said that Congress has more than once, with general approval and universal acquiescence, exercised that power by declaring that, when the intrinsic value of gold and silver coin had been slightly reduced, it should still, as before, be a tender for its stamped value. The Constitution having made such coin money, and thereby a tender by tale, without any aid from Congress, it must have continued a tender in the same mode. These unnecessary acts of Congress were, therefore, only declaratory. They did not make the modified coin a tender; it was so independently of them, and would have been as much so without their sanction as with it; and were this not so, it would not even now be a.

legal tender. This sham precedent, therefore, is neither authoritative, nor, in the slightest degree, even argumentative. The possibility of a debasement of coin is also urged to show that the uncertain fluctuations in the value of a paper currency will not justify the presumption that it should never be money as well as the coin, which is also subject to depreciation and occasional oscillation. As this assumption could not effect the construction of the Constitution, either on its history or its face, an answer is scarcely pertinent. But we will just say that a debasement of coin for the wanton purpose of degrading it, is a crime so rare and disgraceful as not to be apprehended in an age of Christian light and morality; and, moreover, that a prudent alloy, but slightly reducing the intrinsic value of coin, would scarcely, and but transiently, deteriorate it as a standard of value, and would still leave it more equable and valuable than any other medium or standard.

Thus history and the Constitution itself sufficiently prove, that, when the people of the States transformed their confederation of independent States into one supreme nationality of delegated and defined powers, their great charter of Union not only transferred no more power over money than to coin it and regulate the value of coin, but, lest the purpose of that limited power might be defeated by their own conflicting legislation on the currency, they buried all their local power over money. And it seems to us that they contemplated gold and silver coin as the only constitutional money or legal tender—for the following reasons:

1st. When the Constitution was adopted, the precious metals constituted the money of the civilized world.

2d. No other material combines the same elements of value, durability, and convenience, all essential to an international currency and measure of value, to secure which from all disturbing interference was the object of granting to Congress the power to coin money, *and of confining money to coin.* And, 3d. The interdiction of State power to make anything but gold and silver a tender for debt, and the studied omission to give to Congress any power over the law

Griswold vs. Hepburn.

of tender, clearly imply that gold and silver were intended to be the only money of the United States; for, if anything else should ever become money, it would thereby necessarily become a legal tender, and the States would be bound to declare it such, and make creditors take it as money.

Without the constitutional prohibition, the States might make anything else a tender as well as money, and thereby defeat the only purpose of giving to Congress the exclusive power to coin money alone. It was, therefore, unnecessary to confer on Congress power to make such money a tender— and it would have been inconsistent with the great popular purpose of the only power over money, to give to Congress the cormorant power to make bills of credit, or any paper effigies, a legal tender.

As some confirmation of our opinion on this subject, we presume to quote a concurrent opinion of an illustrious jurist, who, if not—as often styled—*the* defender of the Constitution, was unquestionably among the most enlightened interpreters and consistent champions:

"Currency, in a large and perhaps just sense, includes not only gold and silver and bank bills, but bills of exchange also. It may include all that adjusts exchanges and settles balances in the operations of trade and business. But, if we understand by currency the *legal* MONEY of the country, and that which constitutes a lawful tender for debts, and is the statute measure of value, then, *undoubtedly*, nothing is included but gold and silver. Most unquestionably there is no legal, *and there can be no legal tender in this country*, under the authority of this government or any other, but gold and silver, either the coinage of our own mints or foreign coins, at rates regulated by Congress. This is a constitutional principle, *perfectly plain, and of the very highest importance*. The States are expressly prohibited from making anything but gold and silver a tender in payment of debts; and, although no such express prohibition is applied to Congress, yet, as Congress has no power granted to it in this respect but to coin money, and regulate the value of foreign coins, it *clearly* has no power to substitute paper, or anything else, for coin as

a tender in payment of debts and discharge of contracts.", "The legal tender, therefore, the constitutional standard of value, is established, and cannot be overthrown. *To overthrow it would shake the whole system.*"

These are the recorded sentiments of Daniel Webster.

And in the *United States vs. Marygold, 9th Howard,* 567, the supreme court, characterizing the money power of Congress as a great trust, said that it involves "*the duty of creating and maintaining a pure and uniform metallic standard of value throughout the Union.*" The trust could never be fulfilled if paper currency could ever be made a legal tender. But, in establishing, beyond legislative interference, gold and silver coin as the only legal money of the United States, the people did not contemplate the total exclusion of a paper currency, which they knew to be an useful and even a necessary auxiliary of commercial exchanges progressively multiplying and expanding. While, with a full perception of the essential difference between currency and money, they fixed gold and silver as the only money, still they expected, as both useful and inevitable, the spontaneous circulation of bills of exchange, government bills, and even bank bills. History attests this, and the debates in convention prove it. They also certify the decisive fact, that not one member, except perhaps one, intended or desired that Congress should have power to enforce such a circulation by declaring paper of any sort money, or making it a legal tender.

Banks, both national and local, may be constitutional. No power could be more conclusively settled by reason, authority, and time, than that of establishing a national bank. And, although no State has authority to "emit bills of credit" —defined in *Craig vs. Missouri,* to be bills issued by a State on *its own credit,* for *the purpose of circulating as money*—yet any State may incorporate natural persons for banking purposes; for, as the only object of such a charter is to impart legal individuality to a multitude of natural persons, and limit their inherent right to loan their own money, and issue their own notes, therefore, the corporation does not derive, from its charter, the power to lend money and discount bills.

And the bank notes are not interdicted "bills of credit." Consequently, such notes, though neither actually nor potentially *money*, may be as legal a currency as bills of exchange, and this, therefore, is prescriptively settled. So, too, Congress had authority to issue treasury notes on the national credit as "necessary and proper means" for fulfilling "the end of the express" power to borrow "money." And, according to the government credit, they might lawfully circulate as voluntary currency, and, in that conventional character, might constitutionally pay duties, taxes, and all the public expenses, civil and military. But, apprehending a ruinous depreciation if left to depend on their own intrinsic credit, Congress, in the hope of elevating them to a higher and more uniform standard, thought fit to declare them *money*. Its power to do that is now the question. Some of the advocates of the power defend it by a vague and fervid declamation which the judiciary should never hear or heed. They appeal to the transcendental law of "*necessity;*" and assume that the act declaring treasury notes money, and making them a legal tender in payment of "private" debts for enforcing their circulation as money, was indispensable to the salvation of the life of the union, and did, in fact, save it. This forlorn plea is not sustained by either reason or history.

Was the credit of the government, with all its manifold and immense resources, so low or sinking so fast as to require the prop of the tender act? No; and truth echoes, everywhere, No. Was unlimited taxation a barren or an unavailable power? And might not a judicious resort to that resource, aided by other ample means, have secured the credit of the government, and, more certainly than the tender act, have upheld its treasury notes? And would not such a draft on the property of the people in proportion to their means have been far more equally distributive of the common burthen than that which was imposed chiefly on one class?

With the full benefit of the tender screw, treasury notes sank below the alarming mark of more than two for one, and the heavy loss fell, not on the government only, but also on the laboring classes, and peculiarly and unequally on the

creditor class. Had Congress, instead of trying the tender expedient, the constitutional availability of which was generally distrusted, properly increased the taxes and pledged the public revenue and lands, in the security of which all would have trusted, treasury notes would have been much more accredited. Or, had it made those notes, like the "five-twenty" bonds, draw a moderate interest, this alone, without increased taxation or coercive tender, would have prevented their depreciation to so low an ebb as that to which, with the tender prop, they were doomed to fall. This is well illustrated by the historic fact that interest-bearing bonds, which were never made a tender, always stood higher than the tender notes. But had augmented taxation and plighted revenue and lands, and interest-bearing notes, been combined, who could doubt that the notes would have maintained a much higher and more equable standard of value than they did?

Then, although the issue of treasury notes became necessary for the suppression of the rebellion, yet how, or in what degree, did the legal tender quality become necessary to save the union, or how, and in what degree, did it actually contribute to its salvation? The impartation of that quality may have promoted the circulation of the notes, and facilitated the payment of private debts. But how far the increased circulation and more easy payment of the people's debts aided the government, no one can tell. We cannot see that it was necessary to save the union, nor can we believe that, without it, the rebellion—unsupported, as it was, by equal money or credit—could ever have succeeded. And we feel quite sure that it might have been more easily and economically suppressed, had the tender been omitted and other and better means, as just suggested, been employed.

But, even if that experimental expedient alone had been the most hopefully efficient, and had all the virtue which has been imputed to it, the concession of that fact would not prove the constitutionality of the tender act; for expediency is not power, nor is necessity a law to the judiciary.

The *salus populi* may excuse usurpation, but can never make it law in this country, where it is our birthright to claim and

Griswold vs. Hepburn.

to enjoy the protection of a more supreme law, which recognizes no such plea as necessity, and where we all know that usurpation, for any cause, is insurrectionary in principle, and, if connived at by the judiciary, revolutionary in fact. "*Military necessity*" may, more than any other, command a temporary submission to usurped power. Yet the Constitution, recognizing no such law, should finally triumph through an independent judiciary, which will, sooner or later, right the wrong. And whatever may be occasionally said or thought to the contrary, it is a gospel truth that the ultimate welfare of our people depends on the integrity and practical supremacy of their fundamental law.

Then, having defined implied power, and shown, as we think truly, that all claim to such power must harmonize with the spirit and design of the Constitution, and having, also, endeavored to prove that the history and context of that organic law constructively allow nothing to be made money except gold and silver coin, and forbid a compulsive tender of anything else than such money, we now, finally, inquire how, or whence, did Congress derive the power to make treasury notes money, or a lawful tender for money? This power is claimed as incidental to some one or all of the express powers—to *declare war*—to regulate commerce—and to borrow money.

Unless we are greatly mistaken in the foregoing outline, this power is not constitutionally incident to any of these express powers, nor to all of them together. It is not a "necessary and proper" means to the constitutional end of any one of them.

The power to regulate commerce does not extend to the internal commerce in a State, and, therefore, cannot apply to contracts growing out of any such local intercommunication. Nor does it carry with it the power to create the medium of exchange, foreign or domestic. That is fixed by the Constitution; and, moreover, a fluctuating paper currency deranges and cripples commerce, instead of regulating it. *War* can not give to Congress any power not conferred by the Constitution. It may afford occasions for the exercise of some

power dormant in peace, but it cannot give any power not delegated by the Constitution, nor, especially, any prohibited by its letter or its spirit, which are the same at all times, and, theoretically, as supreme in war as in peace, and as much so over soldiers as citizens—over armies as Legislatures. If this be not true, the powers of war may become omnivorous.

In times of popular effervescence or the turbulence of war in any of its forms, and especially in that of civil strife, the liberty and security guaranteed by the Constitution are in much more danger than in the tranquil season of peaceful repose; and the practical supremacy of fundamental principles is far more needful when tumultuous passions agitate the popular mind than when its calm reason rules. And, therefore, the Constitution was made more for stormy than quiet times, and should as certainly and constantly operate supremely. The government, through its Congress or its army, has no more right, in war than in peace, to take private property without just compensation, which can be measured only by proof, to decide on which is a judicial function, wisely withheld from the legislative department, and the assumption of which by it would make this cherished guarantee a mockery, and frustrate its conservative aim.

If, therefore, Congress, in peace, cannot make any other kind of money than gold and silver, or force anything else as a tender for money, no such attempts would be legalized by war. But war created the necessity, and furnished the occasion, for the exercise of the power to borrow money, which was lawfully done in the mode of issuing treasury notes. And, consequently, if there was implied power to declare those notes money and make them a legal tender for money due on private contract, it must be incident to the borrowing power, and to no other express power. And if these treasury notes be money, to issue " money " " *to borrow money* " would be a strange solecism. But we can scarcely see that such an enactment was, in the constitutional sense, a " necessary " mean to the end of borrowing; for it does not certainly appear to have essentially facilitated that object, crippled, as it was, by the act which employed it as a mean—and it is quite

evident that, if, abstractly, it might have had some such effect, it was more than neutralized, even to the great depression of the notes, by the provision in the same act, which, instead of requiring duties on imports to be paid on those notes, exacted gold and silver. But however this may be, we cannot doubt that the expedient resorted to was not, in the constitutional sense, a "proper" mean. And this is already demonstrated, unless we are mistaken in the foregoing principles and illustrations of the Constitution bearing on the term "proper," or in the conclusion that the provisions, spirit, and history of the Constitution forbid anything but gold and silver as money or as a tender on contracts for money. And if we are right, as we feel well assured we are, no one can pretend that the power assumed is, or could be, implied, *because it is an axiomatic truth, that nothing inconsistent with the Constitution can be implied as constitutional.*

And had there been no other objection to the assumed implication in this case, it would be repelled by the fact that to make money and fix the law of tender are great substantive powers; *recognized and disposed of by the Constitution*, and, therefore, no power on that subject can be implied beyond or different from that expressed.

The intrusion on State jurisdiction over private contracts furnishes another kindred illustration, equally apparent and conclusive.

To make treasury notes a legal tender in satisfaction of a contract for money, deriving its obligation from State laws, unconstitutionally impairs the legal obligation of the contract.

The legal obligation of a contract arises from, and is moulded by, the civil remedy provided by law for upholding and enforcing it. The law obliges or coerces, by some remedial process alone; and without legal remedy there can be no legal obligation.

But whenever there is such remedy there is such obligation. Man's ingenuity cannot show how legislation can destroy or impair the obligation of a contract otherwise than by operating on the remedy. Any legislative act that takes away all remedy, destroys the obligation; and any such act as impairs

the remedy, thereby impairs the obligation. Right and remedy are different things; and, consequently, no retroactive change in the remedy existing under the *lex loci* at the date of a contract would impair its obligation, unless the substituted or modified remedy is less stringent, available, and effectual; but any change that makes the remedy less efficacious, to that extent unquestionably impairs it.

The law, under the sanction and faith of which a contract is made and to be performed, defines its obligation. And, therefore, any legislative act that makes the right less valuable and available, so far impairs the obligation of the contract. The contract in this case bound the debtor to pay the creditor a certain sum in *money*. The law of Kentucky, where the contract was made and to be performed, entitled the creditor to remedy to enforce the payment, *in money*, of the stipulated amount. And, of course, any legislation requiring him to take anything else, or of less value, would impair the legal obligation of his contract. Treasury notes are not money. Nor are $100 of such paper equivalent to the same sum in money. To the extent of the difference, the two things are not commensurable in either kind or value; and, to the same extent, the creditor, if not permitted to recover his debt in money, or, if compelled to take less than its value, is legislated out of it. The tender act of Congress, therefore, if enforced, impairs the obligation of the contract.

But the appellee insists that Congress had a constitutional right thus to impair. And, in support of that assumption, his counsel argued, that, as the provision in the Constitution prohibiting all State legislation impairing the obligation of contracts does not apply to or restrain Congress, this pretermission implies a concession of that power to Congress. This presents an unsettled, difficult, and very important problem for judicial solution. On full consideration, our conclusion is, that Congress neither has, nor consistently or safely could have, any such power, except so far as it has been granted in the express power to establish an uniform system of bankrupt laws.

Griswold vs. Hepburn.

For the harmony of the Union, and the equality of com-
mercial rights and intercourse between the people of the
States, it was thought that bankrupt laws should be the same
in all the States.    And as that unity could be secured only
by one will, the States delegated to Congress power to estab-
lish an uniform system of bankrupt laws, and reserved, each
to herself, all other power over private contracts.

A bankrupt law imports, *ex vi termini*, a release of a debtor
on prescribed conditions without paying the debt; and, there-
fore, this grant gave Congress the power, in that class of
cases alone, to impair the obligation of contracts; and, by
necessary implication, it could exercise no power over any
other class of contracts, all of which, according to the Fed-
eral theory, belong, and should belong, exclusively to the
States, such private contracts being more local than national
in character and interest.    And knowing that Congress could
rightfully exercise no power over contracts beyond what they
granted, and having granted a limited power, the people,
however tenacious of their local power, did not find that it
was either fitting or consistent to insert an express prohibi-
tion against the exercise by Congress of power not granted
to impair the obligation of contracts.    The simple fact that
they granted only a limited power, implies that they intended
that Congress should not exercise an unlimited power or one
less restricted.    And that implication is made unquestionable
by the proceedings of the convention, and by the fact, also,
that the motives which dictated the prohibition to the States
applied, to a great extent, and in a controlling degree, to
Congress as well as to State Legislatures.    To concede to
Congress power over the obligation of all private contracts
made under State laws, would change the theory of national
and local power, alter the established and only safe or con-
sistent test of power, and dangerously tend to too much
centralism.    This alone would be sufficient to repel all impli-
cation of power to make paper a lawful tender.    We are
therefore of the opinion that Congress has no constitutional
power to impair the obligation of contracts beyond its ex-
press power over bankruptcy.

The case of *Weston vs. the City of Charleston* is, however, cited to show, that, as the express power to borrow money gave to Congress the incidental means to borrow on the best terms, any adaptable means may be chosen and maintained, even though it may intrude on State rights.

But the principle of that case is not applicable to this.

In that case, the supreme court decided only, that, though a State had a general right to tax all property within its local jurisdiction, yet it could not tax the bank of the United States, because that institution had been constitutionally established by Congress, and there could be no antagonistic power in a State to destroy it, as might be done by indefinite taxation. But in this case the question is one of power in Congress to make treasury notes a tender; and in deciding whether there was implied power to make them a tender, its inconsistency with the Constitution and its interference with rights reserved by the States and intentionally withheld from Congress, is not only admissible, but conclusive to show that such a mean is not "proper," and that, therefore, there could be no such implied power. The power to establish the bank had been adjudged as implied, and it never could have been decided to be constitutional had it been deemed inconsistent with the Constitution, or with State rights, which would have negatived the implication. And that is the question in this case. Had the tender act, like the bank charter, been adjudged constitutional, and then had a State attempted to resist the tender because it interfered with its own power over contracts, the case cited would have been analogous in principle. But the two cases are, in fact, antipodal in principle, and the cited case does not touch the case in hand. Without further elaboration, we are content with the conviction that the following conclusions are inevitable:

1st. The people, in adopting their national Constitution, with signal emphasis and impressive forethought, established gold and silver coin as the money, and the only legal money, of the United States.

2d. To secure their well-considered object, they determined that no legislation, State or national, should ever make any-

Griswold vs. Hepburn.

thing else a legal tender for money demandable on any con-
tract made between citizens under the sanction of State
laws.

3d. That they experimentally understood the radical differ-
ence between constitutional *money* and a mere paper " cur-
rency; " and intended that no such mere currency should ever
supplant the use or shake the stability of gold and silver as
the true standard of value for money and for property.

The necessary corollary is, that all power not expressly
delegated over money is constructively *forbidden.* And if
this be true, there can be no implied power to make treasury
notes a legal tender in private contracts. And this ultimate
conclusion is illustrated by the significant fact, that, for more
than seventy years succeeding the inauguration of the Union,
Congress, in no financial pressure or vicissitude of fortune,
ever, until February, 1862, attempted to make treasury notes,
or any other paper credit, a tender for individual debt. To
declare what shall be money and what a legal tender is a
substantive power, *fully executed by the Constitution itself, and
not left to ordinary legislation;* and even otherwise, could not
be implied as " necessary *and proper* " means subservient to
the end of the express powers.

For the foregoing reasons, we not only see no plausible
ground for the constitutional foundation of so much of the
act of February, 1862, as declares United States treasury
notes to be money, and a legal tender in payment of debts
on private contract, but we think that it is destitute of any
such support, and is *clearly* unconstitutional, and, therefore,
should not be enforced as law.

Wherefore, a majority of the Court—Judge Williams dis-
senting—adjudge that the chancellor erred in requiring the
appellant to accept treasury notes in discharge of his contract
for money.

In coming to this conclusion, we have looked only to the
clear and only safe horizon of power defined by the Constitu-
tion, and illustrated by such jurists and publicists as *Hamilton*
and *Madison* and *Marshall* and *Webster*, all of whom were
sufficiently latitudinarian. That line, consecrated by both

authority and ti ne, we have long regarded as the true boundary of constitutional liberty and union. Beyond this there is no boundary line either defined or definable. To pass or obscure it, would change the equipoise of our correlative governments, and open a wide door to anarchy and despotism. And such an adventurous experiment would be pregnant with peril to our institutions.

To avoid it, and realize the hopes of our fathers, we must stand where they stood—*super antiquas vias.*

We apprehend that the tender enactment passed the true conservative line; and we do fear, that; if that leap be finally sanctioned, the power of Congress may soon become practically unlimited and illimitable, except by discretion and policy; we can see no other limit—none other has been defined in this case.

Persuaded that we are right, no apprehension of inconvenient consequences merely fiscal, nor of human responsibility, could excuse the announcement of any opinion which is not conscientiously our own. To guard the Constitution is the highest trust of the judiciary. And thinking as we do, were we to bow to any other power than the law, as we understand it, we should feel guilty of a criminal breach of trust and a shameful desertion of our post. Looking neither to the right nor to the left, we must know nothing but the *law*, and shall quietly pursue its straight and luminous pathway just as our own eyes see it. And we feel assured, that, whatever popular apprehension might be hastily awakened by an authoritative affirmance of our decision, it would soon be found to have been chimerical, and would be more than compensated by the assured fact that the Constitution, thus rescued from a labyrinth of arbitrary construction without any certain and assuring clue, would be hallowed by restored confidence and by revived hopes of its longevity and beneficence. Public necessity is an arbitrary and unsafe dictator; and to save, while salvable, from its lawless dominion, an upright judiciary should now, if ever, self-sacrificingly if need be, illustrate the righteous maxim of Christian patriotism— "*Fiat justicia ruat cœlum.*"

Wherefore, the judgment of the chancellor is reversed, and the cause remanded with instructions to render, in appellant's favor, a judgment conformable with the principles of this opinion.

JUDGE WILLIAMS, DISSENTING FROM THE MAJORITY OF THE COURT, DELIVERED THE FOLLOWING OPINION:

Congress, by an act approved February 25th, 1862, authorized the issual of treasury notes of the United States, and enacted that they should be a legal tender in the payment of all private and certain public debts. The sole question in this case is as to the constitutionality of said act.

Has the United States Constitution declared what shall be a legal tender? seems to be naturally the first question to solve; for if so, no act of Congress could alter it, and it would not be an open question for judicial investigation and determination.

Previous to the formation of the national Constitution, the colonies, and then the States, in the exercise of sovereign power, had frequently, each for itself, within its own jurisdiction and for its own citizens, declared what should be a legal tender, not always restricting this to either metallic or paper money, but sometimes declaring tobacco and other commodities a legal tender.

By section 4, article 9, of the Articles of Confederation, it was provided " that the United States in Congress assembled shall also have the *sole exclusive right and power* of regulating the alloy and *value* of *coin* struck by their own authority or by that of the respective States."

In the formation of a national, sovereign, supreme government, it was deemed proper that the States should surrender all their sovereign power over this vast and important subject, save alone the right to declare gold and silver coin a legal tender which might be made, and the value regulated by Congress; or, if foreign coin, its value so regulated. Hence by paragraph 1, section 10, article 1, United States Constitution, it is provided—

VOL. II—4

"That no State shall coin money, or make anything but gold and silver coin a tender in the payment of debts." And by clause 5, section 8, same article, Congress is given the power "to coin money, regulate the value thereof, and of foreign coin."

But nowhere does the Constitution declare what shall be a legal tender; on the contrary, the language of the Constitution, the history of the convention, the legislative history of the government under the Constitution, all conspire to the inevitable conclusion that it was not intended to fix the legal tender in the Constitution, but to leave it among the numerous subjects of legislation.

"No State shall make anything but gold and silver coin a tender in the payment of debts," leaves the unquestionable right and power in the States to make such coins a legal tender, and how can they so make them but by enactment? If the Constitution has provided that such coin shall be a legal tender, why leave the power still with the States to enact what the Constitution had already ordained? This would be a folly not justly imputable to a body of such wise and patriotic men as framed the Constitution.

Had the Constitution declared what should be a legal tender, this would have necessarily withdrawn it from the subjects of legislation. The power to coin money and regulate its value is not restricted to gold and silver, even if, as contended by some, it only authorizes the coinage of metals.

Congress has already coined copper and nickel, and should it deem the coinage of brass or zinc, or other metals, politic, it is not perceived by what clause of the Constitution the general and unlimited power to coin money is to be restricted so as not to authorize this; and if all these coins of cheap and base metal become lawful money, and a legal tender by virtue of constitutional provision, Congress has placed it in the power of perverse debtors most effectually to destroy their creditors' debt by paying large amounts of these almost valueless coins, notwithstanding Congress has declared that these should not be a legal tender.

Griswold vs. Hepburn.

But to escape the unfortunate consequences of this logical corollary, it is asserted that the clause prohibiting the States from making anything but gold and silver coin a legal tender, restricts the grant to Congress "to coin money," and limits this general power, given in general terms, to the specific power to coin gold and silver. It is believed that, in all the history of our jurisprudence, no rule of construction can be found which applies a prohibition on State legislation as ·a restriction on an express power granted in general terms to Congress.

Such a rule of construction is deemed new, illegal, illogical, and totally unsupported by judicial authority.

Neither can the logic of facts and figures, and the import of general but plain terms, be met by the most beautiful similitudes, elegant amplitudes, dazzling drapery of sophistry, nor rhetorical sentences.

Had the convention intended that Congress should coin gold and silver alone, it would have said so; as it did say the States should make nothing but gold and silver coin a legal tender. To coin money and regulate its value is a very large and general power. To make gold and silver coin alone a legal tender is a very restricted and specific power. It is utterly impossible that the convention could have used these terms as synonymous. They are not so, nor did the convention so use them.

Nor did the convention intend to perpetrate the folly and absurdity of making every coin which convenience and policy might dictate that Congress should authorize, a legal tender; but having wisely invested Congress with the unlimited power to coin money, intended, also, to leave with them the right to declare what should and what should not be a legal tender; subject alone to the qualification that the States might enact that the gold and silver coins authorized, and value regulated by Congress, should be a legal tender.

August 6th, 1787, the committee of detail presented the Constitution as it had been previously agreed upon in convention. The thirteenth article provided that "no State, without the consent of the Legislature of the United States, should

make anything but specie a tender in the payment of debts."
If the convention had understood that nothing but gold and
silver were to be a legal tender, surely they would not have
proposed to leave with the States the power to make some-
thing else such by the consent of Congress; besides, this is a
clear indication that the convention understood that the sub-
ject of legal tender was to be controlled by Congress.

This view is strongly fortified by the discussion on ·clause 2,
section 8, article 1, which, as originally ' reported, gave to
Congress the power " to borrow money and emit bills on the
credit of the United States."

Governeur Morris moved to strike out the words " *and emit
bills on the credit of the United States*," remarking that it would
be unnecessary if the United States had credit; useless and
unjust if they had not.

Mr. Madison inquired—"Will it not be sufficient to *prohibit
the making them a tender?*"

This, said he, will remove the temptation to emit them with
unjust views. And *promissory notes, in that shape, may, in some
emergencies, be best.*

Mr. Morris replied, that striking out the words will leave
room still for notes of a responsible minister, which will do
all the good without the mischief.

Mr. Gorham was for striking out without inserting any
prohibition.    Said he, the power, as far as it will be safe or
necessary, is involved in that of borrowing money.

Mr. Mercer was a friend to paper money, and was conse-
quently opposed to a *prohibition* altogether.    He said: "*It
would stamp suspicion on the government to deny it a discretion on
this point.*"

The clause was stricken out, but no prohibition inserted.
(*See Madison Papers*, 3d vol., *page* 1343, *and subsequent pages.*)

It is remarkable that in this discussion Mr. Madison stood
alone for prohibiting Congress from making these treasury
notes, or bills of credit, a legal tender.    All conceded that
the power to issue such was included in that of borrowing
money, and neither Mr. Madison nor any other ' single, one
suggested that the Constitution had or would fix gold and

silver as the legal tender, nor that to make such bills of credit a legal tender would conflict with any other clause of the Constitution.

And although the 13th article, as reported, was altered by striking out the words "*without the consent of the Legislature of the United States,*" and the words "*gold and silver coin,*" were inserted in the stead of "*specie,*" leaving the Constitution in its present language, that "no State shall make anything but gold and silver coin a tender in the payment of debts," yet this in nowise indicates that it was intended to restrict the powers of Congress, but rather the contrary; nor can this language be rationally construed as restrictive of any of the express grants or necessarily implied powers, from such grants of the Constitution.

Having conferred upon Congress the power to coin money, and regulate its value, and of foreign coin, it was deemed entirely safe to leave with the several States so much of their original sovereign power, on this subject, as to declare such coin a legal tender; but it was regarded as essential they should surrender all other power over this entire subject; this and nothing more, was intended by this language.

The convention well knew that this subject of legal tender had been a fruitful source of discordant legislation by the several States. In the making a supreme, sovereign, perpetual, national government, what could have been more appro- priate and necessary than to give it supreme control over the national currency, by which uniformity of kind and value might be produced among the several States? And although the power to declare gold and silver coin a legal tender was still left with the States, and they could so enact in the ab- sence and perhaps in defiance of any act of Congress, yet this power must be exercised in subordination to the power of Congress to coin the money, and regulate its value, and of foreign coin.

In pursuance of this seeming understanding and intent of the convention, and meaning of the Constitution, Congress, from its earliest existence, has claimed the right to legislate on this subject.

By an act of April 2, 1792, establishing "the mint for striking and coining gold and silver coins," Congress, after prescribing the weight, quality, and value of the coins to be struck, declared "that all the coins which shall be issued from said mint *shall be a lawful tender* in all payments whatsoever."

By an act of February 9, 1793, Congress provided that after the first of the following July, that "the gold and silver coins of England and Portugal, France, and Spain, should pass current as money within the United States, *and be a legal tender* for the payment of all debts." This act repealed the act of August 4, 1790, which, among other things, prescribed that certain foreign coins therein enumerated should be received for duties at prescribed rates; but did not make them a legal tender for any other purpose.

Congress had, from time to time, enacted other laws changing the value of certain foreign coins, and making them a legal tender, sometimes for limited and specified purposes, then, again, for all purposes; now by weight, then by tale. Such were the several acts of April 10, 1806, and March 3, 1823, making them receivable for public lands, and the acts of June 25, 1834, and March 3, 1834, declaring the legal value of certain silver coins, and that they should pass as money within the United States by tale *for the payment of all debts.*

By an act of June 28, 1834, it was directed that foreign gold coins should pass current as money within the United States, and be received in all payments—weight according to the fineness and rates therein specified.

By an act of January 28, 1837, it was provided that the standard for both gold and silver coins should thereafter be of one thousand parts by weight, nine hundred should be of pure metal, and one hundred of alloy, and that the alloy of silver coins should be of copper, and the alloy of gold coins should be of copper and silver; but that not over one half of such alloy should be silver, and the weight and value of each were prescribed and declared to be a legal tender according to their nominal value; and that the gold and silver coin previously issued should continue to be a legal tender at their nominal value as though of the coinage of said act.

Griswold vs. Hepburn.

By an act of February 27th, 1853, the weight of the silver half dollar was reduced from 206¼ to 192 grains, and the lesser silver coins proportionately, and these were made legal tender only in payment of debts for all sums not exceeding five dollars.

Thus it is seen that Congress has claimed and exercised unlimited power over the legal tender, declaring what coins shall be received in payment of debts, and withholding the legal tender quality from others, though coined, and the value regulated by its own authority, sometimes impressing them with the legal tender quality for specified purposes and to limited amounts; at others, declaring them a tender for all purposes and amounts.

This assertion of power by Congress, and the seeming aquiescence, without challenge, by all the departments of the Government, the profession, and people, from the earliest history of the Constitution down to this enactment of February 25th, 1862, is a strong proof of its existence; and this rule of construction has been so often recognized by the supreme court of the United States and the several States, as hardly to need a recital of authority; still, see *Martin vs. Hunter*, 1 *Wheaton*, 421; *Cohens vs. Virginia*, 6 *Wheaton*, 421; *Briscoe vs. Bank of Kentucky*, 11 *Peters*, 257; *Moores vs. City of Reading*, 21 *Penn.*, 188; *Norris vs. Clymer*, 2 *Penn.*, 277; *People vs. Green*, 2 *Wend.*, 274; *People vs. Constant*, 11 *Wend.*, 511.

Another rule of construction has been followed ever since the leading and exhaustive opinion of the supreme court of the United States in *McCullough vs. Maryland* (4 *Wheaton*, 316), by Chief Justice Marshall. Said the court: " Let the end be legitimate—let it be within the scope of the Constitution, and all means which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional." * * * * *
" When the law is not prohibited, and is really calculated to effect any of the objects intrusted to the Government, to undertake here to inquire into the degree of necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative grounds."

If this power to enact paper money to be 'a legal tender is not prohibited, but is an appropriate mean of executing any of the powers granted by the Constitution, it is not a reserved power to the States or the people thereof, and does not come within the prohibitions of the tenth amendment to the Constitution, that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

But it is urged that under the Articles of Confederation Congress did not presume to enact that paper money, or the bills of credit authorized to be issued by said articles, should be a legal tender, and this is true; but it is also true whilst they did not, because they could not, enact these to be a legal tender, they did recommend to the States to enact such bills to be a legal tender, which the States, at the instance of Congress, did do, and this, too, notwithstanding to Congress was given the express, sole, and exclusive power of regulating the value of the coin struck by its own authority and that of the respective States. Hence no force is perceived in such argument; nor is the expression of a fugitive opinion by way of incidental argument on a pending bill, in no way involving the question of legal tender, by even Mr. Webster, deemed entitled to much consideration.

The Constitution has not, then, declared what shall be a legal tender—not even that *gold* and *silver coin* shall so be— nor has it conferred, in direct terms, the power on Congress to so declare. It has, however, left it as a *subject of legislation;* and this power to declare *anything* a legal tender, *whenever* and *wherever* found, will be ascertained among the incidental powers, but still as much *sovereign* as if expressly granted. Is there any inhibition upon the power of Congress to declare paper money a legal tender anywhere to be found in the Constitution, seems to be the next natural and logical question?

The States are prohibited from coining money, making anything but gold and silver coin a legal tender, and enacting any law impairing the obligation of contracts; but no such prohibitions are imposed upon Congress; and it is a most sig-

nificant fact, that, whilst several other prohibitions are imposed upon the States, Congress is only prohibited from three things, to-wit: passing bills of attainder, *ex post facto* laws, and granting titles of nobility; and, as these inhibitions as to Congress are found in the next preceding section to those imposed upon the States, together with the historical facts mentioned, render it impossible to conceive that this most important subject of legal tender could have escaped the attention of the convention.

Had any inhibition been intended, but left out by causality, it would have been found among the amendments to the Constitution, most of which were adopted at the suggestion of the several States made at the time of their ratification, and when the utmost vigilance and jealousy had been excited by the earnest opposition to its adoption, made by the States' rights party, and some of which amendments ·have been adopted since Congress has asserted its right over the subject by legislating thereon.

The Constitution was silent as to what should constitute a legal tender; the States might not declare even gold and silver coin to be such; it was a subject of vast importance; a common and general government was being made, which was intended to be national and supreme over the American people and their States, invested also with sovereignty and perpetuity, and to it was intended to be given the necessary powers to protect this sovereignty, supremacy, and perpetuity, and to enable it to accomplish the great object of its creation, in conducting their foreign relations and. controlling their national affairs.

Among the powers conferred to accomplish these great objects, were the regulations of commerce among the States, to coin money and regulate its value, and of foreign coin, to borrow money, to raise and support an army, provide and maintain a navy, and to call out the militia to repel invasion and suppress insurrection. To inhibit Congress from declaring the legal tender, or enacting that anything but gold and silver should be such, might seriously impair the efficiency of these great powers intended to be conferred without limit, and

produce serious and calamitous embarrassment in times of great national peril.

The national debt was then large, and must be provided for; so scrupulous were our fathers on this subject, that they provided by clause 1, article 6, of the Constitution, that " all debts contracted and engagements entered into, before the adoption of this Constitution, shall be as valid against the United States under this Constitution as under the confederation."

Had the Constitution fixed gold and silver as the legal tender, or had inhibited Congress from making anything else such, the principal and interest of the national debt would have to be discharged in such coins, which was then literally impossible, as the entire gold and silver circulation of the American people was little more than adequate to one year's interest on the national debt.

The total amount of specie received by the United States treasury for the years 1778 and 1779, whilst engaged in the revolutionary struggle, and when much needed, and the authorities exerting every energy to get it, amounted to only $151,666.

After the adoption of the national Constitution, we learn from the reports of Mr. Hamilton, the first Secretary of the Treasury, that the national debt amounted to $94,000,000, bearing an annual interest of more than $5,000,000, when high authority has fixed the entire gold and silver circulation of the people at this time at not exceeding this latter sum.

The scarcity of the precious metals at this period may be somewhat appreciated from the official returns of the operation of the mint established by the act of 1792. From 1793 to 1800, inclusive, a period of eight years, the entire coinage of the government was, of gold, $1,014,290; silver, $1,440,455; total, $2,454,745, or an annual average of something over three hundred thousand dollars. History has well attested that the great financial embarrassments of the United States government, under the Articles of Confederation of the several States, and the people at large, were among the prom-

inent causes which led to the formation of the national Constitution.

It is almost past comprehension that a body of such wise and patriotic men as the American people have been taught to regard the convention, and which have been unanimously accorded them by posterity, could have added to those embarrassments by the adoption of such a provision in the Constitution as was then literally impossible for the government or, people, or both combined, to comply with. The total gold and silver of the country, being inadequate to the payment of the annual interest on the public debt, would have left the people without a constitutional currency to discharge their private obligations. Such a state of affairs must have resulted extremely disastrous to both the government and people, and is a pregnant fact conducive to the belief that the convention did not intend to fix the legal tender in the Constitution, nor to inhibit Congress from the largest jurisdiction over the subject. The situation of the government, the people, and the currency, rendered it impossible for the convention, with any degree of certainty or safety, to fix what should be a constitutional currency alone; but stern, unrelenting necessity, demanded that they should leave it a subject of legislation, trusting to the patriotism and wisdom of the people, and their Congress, and the then unseen developments of the future, to carry them safely through those difficult embarrassments.

The unseen but almost magic increase of the precious metals and wealth of the people, the progress in the powers of the nation, and the many perils by which the government has been environed, the most imminent of which it has just safely emerged from, as the flattering indications assure us, all attest the great wisdom of the Constitution in leaving this subject of legal tender unrestricted with the law-enacting department of the government.

As the Constitution has not ordained what shall be a legal tender, nor has it prohibited Congress from so ordaining, we come to the question whether this power has been conferred upon Congress as a necessary and proper means of executing

other powers expressly granted?   Among the express powers conferred upon Congress by section 8, article 1, United States Constitution, are:

To pay the debts and provide for the common defense and general welfare of the United States.

To regulate commerce among the several States and with the Indian tribes.

To coin money, regulate the value thereof, and of foreign coin.

To declare war.

To raise and support an army.

To provide and maintain a navy.

To provide for calling forth the militia to execute the laws of the Union, suppress insurrection, and quell invasion.

To make all laws which shall be necessary and proper for carrying into execution the *foregoing powers*, and *all other powers* vested by the Constitution. in the Government of the United States or in any department or officer thereof.

As was said by Chief Justice Denio, of the appellate court of New York, in his dissenting opinion adverse to the constitutionality of said act of Congress of February 25th, 1862, in the case of Meyer vs. Roosevelt, September term, 1863 (13 *Smith's N. Y. R.*): " It is not incumbent upon those who argue for the validity of the legal-tender clause to select any one express power.   They may group together any number of these grants of legislative authority, and if the right to enact that provision is fairly deducible from any or all of them, their position is established."

If the power to declare what may be a legal tender does exist, though belonging to that class known as implied powers, it is a sovereign power, and Congress has as much right to enact laws for carrying it into execution as though granted in direct terms.

If this be a proper and necessary mean of executing any one or more of the express powers, it is not only an implied power, incidental to such express power, but, by virtue of clause 18, section 8, article 1, of the United States Constitution, Congress " may make all laws which shall be necessary

and proper for carrying it into execution"—or, in other words, may make all necessary and proper laws to *execute—all the express* and *implied* powers found in the Constitution.

For an elaborate discussion of these sovereign powers, see Norris vs. Doniphon (4 *Met. Ky. R.*, 386, *and Judge Williams's separate opinion*, 403). I also quote from the very able opinion of the appellate court of New York, by Judge Daviess, in the case of Meyer vs. Roosevelt, before recited, sustaining the legal-tender clause: .

"Every form of government unavoidably includes a grant of some discretionary powers.. It would be wholly imbecile without them. It is impossible to foresee all the exigencies which may arise in the progress of events, connected with the rights, duties, and operations of the government. If they could be foreseen, it would be impossible, *ab initio*, to provide for them. The means must be subject to perpetual modification and change; they must be adapted to the existing manners, habits, and institutions of society, which are never stationary; to the pressure of dangers or necessities; to the ends in view; to general and permanent operations, as well as to fugitive and extraordinary emergencies. In short, if the whole society is not revolutionized in every critical period, and remodeled in every generation, there must be left to those who administer the government a large mass of discretionary powers capable of greater or actual expansion, according to circumstances, and sufficiently flexible not to involve the nation in utter destruction from the rigid limitations imposed upon it by an improvident jealousy. Every power, however limited, as well as broad, is in its own nature susceptible of abuse. No constitution can provide perfect guards against it. Confidence must be reposed somewhere; and in free governments, the ordinary securities against abuse are found in the responsibility of rulers to the people, and in the just exercise of the elective franchise, and ultimately in the sovereign power of change belonging to them, in cases requiring extraordinary remedies."

In Anderson vs. Duncan (6 *Wheaton, page* 204), the court said: "The idea is utopian that government can exist with-

out leaving the exercise of discretion somewhere. Public security against the abuse of such discretion must rest upon responsibility, and stated appeals to public approbation. Where all power is derived from the people, and public functionaries at short intervals deposit it at the feet of the people, to be resumed again only at their own wills, individual fears may be alarmed by the monsters of imagination, but individual liberty can be in little danger."

The power to declare the legal tender is not substantive, but incidental to several substantive powers; to coin money and regulate its value is substantive, and to declare such coin a legal tender incidental thereto; to borrow money is substantive, and to use such means as may be necessary to execute it are incidental; to declare war is substantive, to make a blockade and other things may be. incidental thereto; to raise and support an army, provide and maintain a navy, are substantive, to arm, equip, and transport the same, are incidental.

But for the use of gold and silver as a circulating medium by the civilized nations, these would have but comparatively little intrinsic value; they are not intrinsically money; they may be better adapted to that use than other commodities, but who can tell in the progress of science and chemical, geological, and mineralogical developments, that some other metal as well or better adapted to such use may not be discovered?"

The Earl of Liverpool, in his Treatise on the Coins of the Realm ( p. 8, London, 1805), said: "Money is a standard measure by which the value of all things are regulated and ascertained, and is itself, at the same time, the value or equivalent for which goods are delivered." Eckfield and Dubois, in their Manual of Coins and Bullion, and supplement thereto, down to 1851 (chapter 24, No. 642, L. Congressional Library, page 6, which is an official report to Congress on our coins), says: " This is a standard definition given by all the authorities from Aristotle down to the present time."

" The commodity which has thus, by the uniform but silent, unconcerted operation of human motives and action, become

the common medium of exchange and general measure of value, constitutes the money of the community, and in this character *it acquires an additional value.*

"Various articles in different countries and in different stages of society, have, in this way, acquired the property of money.  *  *  *  *  Tobacco was also used as a universal equivalent in Maryland and Virginia." (*Tucker on Money and Banking, pp.* 4 *and* 5.)

In Virginia and this State are to be found statutes giving so many pounds of tobacco as costs by the judgment of court, which were, after many years had elapsed, changed by enacting so that each pound of tobacco should be regarded as of given value, and the costs should be collected in money at such rates. Gold and silver being coined, and the value regulated, and declared to be a legal tender by authority of Congress, became, indeed, "*precious metals.*"

By impressing this legal tender quality on the government's own promises to pay, they too become of "*precious value.*" In what consists the difference of constitutional power in the impressing with a new and valuable, but not intrinsic quality, metals or paper? The greater value of neither is intrinsic, but derived from the omnipotent fiat of Congress in ordaining them to be a legal tender, and making them the legal standard by which the value of all commodities, the discharge of all private liabilities, and the commerce of the country shall be regulated, and by infusing into these inanimate and almost valueless things the vitality of a circulating medium, vesting them with a magic and almost incalculable value.

If the making these treasury notes a legal tender does invest them with this new, inestimable, and magic value, who can say it is not a necessary and proper mean of borrowing money? The power of the government to issue its securities for what it may need, as compensation for either services or commodities, has been so often exercised, so universally acquiesced in, and for so long a period, and sustained in every instance in which the question in any of its phases has come before the courts, as no longer to be considered an open question for further controversy; and having this unquestioned

right, it may issue just such securities as Congress may direct, either as interest-bearing coupon bonds, designed for permanent investments, or stocks, or treasury notes, designed for circulation as a medium. The latter class obtained so early as Mr. Madison's administration, and has been often issued since, with the concurrence of our ablest statesmen and jurists, even embracing those of the most rigid construction and extremest States' rights schools. Even Mr. Calhoun, in the United States Senate, January 16th, 1840, said: "Paper has, to a certain extent, a decided advantage over gold and silver. It is preferable in large and distant transactions, and cannot, in a country like ours, be dispensed with in the fiscal transactions of the government, without much unnecessary expense and inconvenience, the truth of which would soon be manifest if the government should consent to dispense with the use of treasury drafts. But this is not the only form in which it may be necessary or convenient for it to use its own credit. * * * I am decidedly opposed to government loans. I believe them to be, in reality, little better than a fraud on the community, *if made in bank notes*, and highly injurious if made *in large amounts in specie*. * * * It may be laid down as a maxim, that without banks and bank notes, large government loans are impracticable, and without *some substitute*, such loans, in the event of a war, will be unavoidable. The only substitute will be found to be in *the direct use by the government of its own credit.* * * I also regard the use by the government of its own credit *in the form of treasury notes, or some other better form*, as indispensable to the permanent success of the policy of this bill." (*Sub-treasury bill.*)

On a bill authorizing the issual of treasury notes, he, on September 19, 1837, said: "Believing that there might be a sound and safe paper currency *founded on the credit of the government exclusively*, I was desirous that those who were responsible, and have the power, should have availed themselves of the opportunity of the temporary deficit in the treasury."

In a rebellion of such gigantic proportions and vast magnitude, requiring an army of a million of soldiers and sailors to

suppress it, involving the government in a daily outlay of say two millions of dollars, or of an annual expenditure of say seven hundred and thirty millions of dollars, could this vast army have been "raised and supported," and this immense navy "provided and maintained" on the circulating medium of the loyal States, including the specie and paper currency, and that which belonged to individuals and corporations? The precise amount cannot be ascertained; but we have sufficiently accurate data to direct with almost absolute certainty to a correct determination. By reference to *United States Bankers' Magazine* (*vol.* 12, *p.* 341–2); it will be ascertained that the specie in the banks of the loyal States, at the breaking out of the war, amounted to $76,314,712, and the circulation of said banks to $139,577,439; total, $215,892,151; thus the entire capacity of all the banks of the loyal States was something less than adequate to one hundred and twenty days' expenditure. But it would have been wholly impracticable, yea impossible, for the banks to have collected from their customers this circulating medium, and any attempt to do so would but have intensified the financial panic of the first few months of the war, and produced general bankruptcy upon the people and disaster to the government.

What the amount of specie in individual hands was cannot be ascertained with any satisfactory degree of certainty, nor is it important to do so, for whether large or small, it was soon hoarded and secreted, and of but little more use to the government than if it had not existed.

The dangers attendant upon war, even with foreign nations, have always caused the hoarding and secreting of the precious metals. No government, however energetic and despotic, can prevent this; private cupidity, stimulated by alarm, has ever been, and will ever prove, too active, sagacious, and efficient for the strongest and most vigilant government.

This cupidity, sagacity, and energy are greatly enhanced by the perils of a civil commotion endangering the existence of the government, unsettling private rights, making uncertain private property, and jeopardizing personal liberty; whilst

in a government mild and liberal, and beneficent in its pro-
visions and action, scarcely any restraint is found over this
controlling passion of the human heart to provide against
these perils and calamities.   The inevitable consequence of
this rebellion, as in all past times, was to create alarm and
distrust; each man became a vigilant guard for his own inter-
est and that of his family; the creditor desired to realize his
debt, and that, too, in specie, so far as at all practicable; the
holders of bank notes desired them redeemed in gold.   In
this active state of alarm and vigilant caring for private
interest, the banks were soon driven to a suspension of specie
payments, the gold and silver coins sought the places of safe-
ty, secrecy, and darkness.   No longer did these perform the
functions of a " circulating medium," and he that sought for
these could most truthfully return " *non est inventus.*"

A financial and commercial panic seized upon the country.
The treasury of the government was empty, its necessities
numerous and most pressing; it wanted to borrow large sums,
but where were the lenders?   The banks might be depended
on to supply the first needs, but these would soon become
exhausted, because so greatly inadequate.

If the government would preserve its own national exist-
ence *it must* " raise and support " immense armies, " provide
and maintain " vast navies.   To do this required more money
annually than the entire circulation of the banks, and the
gold and silver coins of the banks and the people of the loyal
States.

With a strong, not to say unfriendly, disposition on the part
of the governments and people of the two leading maritime,
manufacturing, commercial, and wealthy nations of Europe,
to exaggerate the dangers and weakness of the government,
and magnify the strength and certainty of success of the
rebellion, hopes of a foreign loan could not be reasonably
entertained.

Besides, the government must encounter all the moral influ-
ence and financial power of the disloyal at home, who, not
content with abstracting the gold and silver coins from the
use of the government, but were constantly, with an energetic

Griswold vs. Hepburn.

vigilance, decrying the government credit and securities, using their financial talents to create and spread distrust and alarm, and their financial and money power to sink the government credit to the lowest grade.

In this transition state from peace to war, revolution in the habits of our people and the commerce of the country, surrounded by disloyalty, distrust, and alarm, the government must provide for these new exigencies, unforeseen, consequently unprovided for, but still imperious in their necessities, else its armies could not be " raised and supported," its navies could not be " provided and maintained," and, without these, it could not perpetuate its national existence, but must vanish from the world as a thing of the past, and with its downfall must go the last brightest evidence of man's capability for self-government. If, then, to issue its own " promises to pay," in convenient form and amounts for circulation, and to impress these with a new and magic quality and value, and thereby provide for this overruling necessity, and at once place the government in possession of the necessary means to " raise and support " its army and " provide and maintain " its navy, how shall it be said this was not a necessary and proper law for executing these powers?

And if it was a proper and necessary mean of executing any of the enumerated powers, it was not only incidental to such powers, but expressly authorized by clause 18, section 8, article 1, of the Constitution.

But it is said that had Congress increased the taxes, and pledged the public revenue and lands, or had it made treasury notes interest-bearing, it would have much more sustained the credit of the government and these notes, than to make them a legal tender.

Now, it so happened, that at the very session that enacted this legal tender, immense taxes were laid, the revenue pledged, two years' five per cent. semi-annual coupon legal tender treasury notes were also authorized and issued, and, notwithstanding the legal tender quality was imparted, with all the other props suggested, the credit of these treasury notes, of all classes, continued to sink, until they would not

command in market forty per cent. of their par value in gold and silver, and is but another evidence of the impracticability and unreliability and very insignificant value of speculative theories.

It is again said the five-twenty bonds were more valuable than these treasury notes. The history of the gambling markets of New York would show they varied from a few cents below to a few cents above their par value, in these treasury notes, perhaps a larger part of the time above par; but when it is remembered that these bonds were to be paid at maturity in gold, and the interest was to be paid semi-annually in gold, this fact affords neither argument nor inference.

If this power does exist, its existence is contemporaneous with the Constitution, although the occasion for its exercise may not have occurred until long since.

There are powers which were conferred by, and exist contemporaneous with, the Constitution, which were not intended nor expected to be exercised in times of peace.

Then whether the power to make these treasury notes a legal tender be alone included in the power to coin money and regulate its value, and of foreign coins, or to borrow money, or to regulate commerce among the States, or to raise and support an army, and to provide and maintain a navy, or to provide for calling forth the militia to suppress insurrection and enforce the laws of the Union, or whether it is a proper and necessary mean of executing any one or more of these powers, it is equally authorized by the Constitution, and obligatory as law.

These express, sovereign, and unlimited powers were conferred upon the national Government for the transcendent purpose of perpetuating its existence, and thereby securing the liberty and nationality of the American people to the latest generation; and then, lest there should be some infirmity in the language conferring the powers, clause 18, section 8, article 1, gave to Congress in the broadest language the most plenary power " to make *all laws* which shall be *necessary and proper* for carrying into execution the *foregoing powers* and

Griswold vs. Hepburn.

*all other powers* vested by this Constitution in the government of the United States or any department or officer thereof."

As it was intended by this clause to perfect all the vested powers in their fullest significance and amplitude, Congress must, to a great extent, be left to judge what laws should be necessary and proper for the execution of the vested powers; and in a government deriving its powers from the people, being made to promote their general welfare, and to secure the blessings of liberty to them and their posterity, its laws designed to be the embodiment of public sentiment, subject to be changed and modified by this potent agency, as is also the Constitution itself, where could discretion be more safely or properly lodged than in the representatives of the people and their States? And before courts will unsettle the decrees of this, a co-ordinate department with their own, vested with the high powers of enactment presumed to represent and respond to that public sentiment which was designed to be uncontrolled and omnipotent within the sphere and allowances of the Constitution, they must be satisfied fully and clearly that the enactment is without the authority of the Constitution, and every rational presumption in favor of its validity is to be indulged.

Having shown, as is trusted, with reasonable certainty, that the Constitution does not declare what shall be a legal tender, nor has it restricted the legal tender to any kind of metals, coins, or money, and the power to declare these treasury notes a legal tender is not a substantive but derivative power, and was a necessary and proper execution of several vested powers, it remains to vindicate the justice and legality of making them such in the discharge of pre-existing debts, and that neither law, Constitution, nor good conscience demand that any more than the nominal amount should be required in the discharge of such debts.

This power to declare what shall be a legal tender existed from the adoption of the Constitution, to be exercised in such manner, and under such modifications, as circumstances might require, and the exigencies of the government might demand, and the general welfare of the people might indicate; and its

exercise being of mutual hazard to the creditor and debtor, and whether the one or the other class might be the more seriously affected, would be equally just, as its exercise must be presumed to be for the "greatest good to the greatest number," and not to foster or inflict private interest, hence individual interest should yield to the public welfare and necessity.

It has been already remarked, that whilst the States were prohibited from enacting laws impairing the obligation of contracts, none was imposed on Congress, but, on the contrary, Congress is authorized to "establish uniform laws on the subject of bankruptcies throughout the United States." (*Clause* 4, *sec.* 8, *art.* 1, *Constitution.*) It is true that this language does not in terms apply to pre-existing debts, yet the courts have unanimously upheld the constitutionality of bankrupt laws, by which the debtors in pre-existing liabilities have been released on their own voluntary application, and such laws have been adjudicated to be constitutional by that august and supreme tribunal, which the people and States have selected as the final arbiter in all questions of "law and equity arising under this Constitution and the laws of the United States," &c., to-wit: the supreme court of the United States.

These bankrupt laws have been sustained when applying to pre-existing debts, on this principle: that this was a sovereign power vested by the Constitution in Congress, and liable to be exercised by them at any time; hence that each contract was made with the legal implication that the obligation should exist until discharged by the obligor, unless Congress should, in the meantime, provide for the obligor's release by a bankrupt law. Precisely so as to legal tender—this power to declare the legal tender is sovereign, though belonging to the class of implied powers: when Congress enacted that gold and silver coins should be a legal tender, every contract to pay dollars was a contract to pay that many dollars of the gold and silver coins so declared to be a legal tender, with the further legal implication that if Congress, in the meantime, should enact that something else should be a legal tender,

that the debtor might discharge, and the creditor would receive, in this new legal tender money or currency, the exact amount of dollars named in the obligation; and this implied condition is as much a part of the legal contract as its express conditions.

Congress has in various ways affected the obligation of contracts, sometimes in favor of the creditor, then in favor of the debtor. Such has been the effect of making gold and silver coins a legal tender when, previously, Continental and other paper money and commodities had been a legal tender. War has always seriously affected contracts and often annihilated the rights of the creditor. Embargoes and blockades have had a similar effect, and the bankrupt laws annihilated the obligatory force of the contract; yet all these have been upheld by the highest judicial authority.

The gold coins by the act 1834 had been so debased that ninety-four eagles of the previous coinage contained as much gold as one hundred under this act; yet it took as many of the old eagles to discharge a debt as of the new eagles, although the old had a greater market value than the new; yet these were of equal value in the eyes of the law, because both were a legal tender, so declared by Congress, for their nominal value or amount, and not for their marketable value.

This change of the legal tender is no new principle either in English or American legislation. In Poug vs. De Lindsay *et al.* (*Dyer*, 82 *A.*), in debt on bond for payment of £24 sterling, plea of tender, that at the time of payment of said sum of money, certain money was current in England in the place of sterlings called pollards, held, that if, at the time appointed for payment, a base money is current in lieu of sterling, tender at the time and place of that base money is good, and the creditor can recover no other.

Where the obligation was to pay on a given day five quarters of wheat, which were worth fifty pounds on the day of the contract, but only five pounds on the day of payment, the judgment was for the five. quarters of wheat or *five* pounds, is recited from the year books II H. VII., 36.

Queen Elizabeth, by proclamation of May 24th, in the 43d year of her reign, declared and established as lawful and current money of Ireland a certain *mixed money,* which she had caused to be coined in the tower of London, to pay the royal army, and carry on the war in the rebellion of Tyrone.

Brett, a merchant of Drogheda, bought goods of Gilbert in London, and became bound to him for £100—previous to said proclamation. Brett made a tender of the £100 in this mixed money—this was held a good tender. (*Daviess R.,* 28. *In Barrington vs. Potter, Dyer,* 816, *fol.* 67). After the fall and debasement of money in 5 Edw. VI., debt was brought on lease for two years rent in arrears, which fell due at Mich. Term, 2 Edw. VI. The lease was dated November 21; 31 year Henry VIII. At the time the rent fell due the shillings were current at 12 pence, which were decried to 6 pence at the time of bringing the action. The defendant pleaded tender on days of payment in *peciis monetæ anglicæ vocat* shillings, and averred that each shilling was payable at 12 pence when tendered, the plaintiff received 'the money after demurring. "If foreign coin be made current at a higher rate than its intrinsic value by proclamation, a tender in such money is good in Great Britain." (*Bacon's Ab. Tender, b.* 2, *vol.* 7, *p.* 325.) The same principles have been upheld by the American courts. In Faw vs. Martellar (2 *Cranch,* 20). In the year 1779, when Virginia currency consisted of paper money, Faw, obligated himself to pay as yearly rent twenty-six pounds *Virginia currency;* but paper currency, which was lawful money at that date, had been withdrawn by a law of 1781, the defendant insisted he could only be compelled to pay in 1782 what this Virginia currency was worth at the time of the contract; that he had not contracted to pay specie, which was the legal currency at the time of the judgment; but the court by Chief Justice Marshall held: "This can only mean money current at the time the rents shall become payable. * * * The position that the *value of the money at the time* when the consideration for which it was to be paid was received is the standard by which the contract is to be measured, is not a correct one."

The case of Dowmans vs. Dowmans' exr. (1 *Wash. Virg. R.*, 26), was a suit on bond for £53 *payable* in Virginia currency; the court held that there was no paper circulation held as current money in April, 1790; that the tender must be money current at the time of the tender, else it is not a legal tender; and that the currency named in the bond having ceased to be current money, would not do to tender; that the legal effect of the bond was to pay £53 in such currency as was current at the time of payment.

In United States vs. Robertson (5 *Peters*, 644), the supreme court of the United States, by Chief Justice Marshall, said: "An obligation to payment generally is discharged by a payment in legal currency."

It will be perceived that the debtors derived the benefit from the alteration of the currency in the recited English cases, whilst the creditors derived the benefit in the American cases.

In the debasement of the gold coins by Congress, the debtors derived a great benefit; but these benefits to private parties were not the moving motive of either England or America, are merely incidental to a great public policy, adopted to meet the exigencies of the times, protect the public, and perpetuate the government.

Private interest, including gains and losses, must be secondary and subsidiary to the great public policy so essential to the protection and preservation of the government. An overruling necessity has required of Congress another change in the lawful current money of the country; the private interest of the debtor class is benefited by this change, and the creditor class may be injured; but why should the creditor, any more than the debtor, be permitted to obtrude his private interest to thwart an essential public policy?

These powers were given for wise and beneficent purposes. It was not to be presumed that Congress would lightly trifle with the great interest of the community, work a revolution in the currency and commerce of the country, without the most urgent necessity.

The necessity for these changes cannot be foreseen and provided for, but must be acted on when presented. The hazards of such changes are mutual; no man can, therefore, rightfully complain of the injustice of his government when these changes are so cautiously made, and for such weighty reasons. The love of gain may not be gratified, and private cupidity may be disappointed, but the patriotic will find ample compensation for his incidental losses in the welcome reflection that his government has been rescued from ruin, its free institutions perpetuated, his private fortune secured from wreck and ruin, and his individual liberty and the liberty of his posterity guaranteed by the preservation of the Government, and that this legal-tender act has contributed much to this preservation.

Now that many hundreds of millions of dollars of this currency has found its way into circulation, the commerce of the country has been adapted to this new medium. Millions upon millions of both public and private liabilities, entered into upon the faith that it was a legal tender; hundreds of banks organized upon this basis, with many millions of circulation; the soldiers and sailors been paid with it for their perilous and meritorious services, neither justice nor sound policy requires that this new state of affairs should be unsettled, another commercial and financial revolution produced, private fortunes wrecked, private rights disturbed, and the great interest of society wantonly tampered with.

Before courts should be expected to pronounce judgments thus unsettling acts of Congress, the great business of communities, and producing such momentous and sad results, a stern, unrelenting necessity to preserve the Constitution should be clearly demonstrated.

There is but one legal standard by which to measure the payment of debts, and that is to require the debtor to pay the number of legal dollars which may be called for by the contract and adjudged against him.

The law does not admit of any difference in the value of dollars of its legal currency, however the market value of the one or the other currency may differ or vary. The gold dol-

lar declared to be a legal tender will discharge precisely a dollar, nothing more; the treasury note dollar declared to be a legal tender will discharge precisely a dollar, nothing less.

This rule of the law is plain, easy, and simple, and harmonious in all its workings. Depart from it, and confusion and embarrassment meet us everywhere.

The discharge of debts is rendered complicated and uncertain. If a debtor cannot pay a thousand dollars of his indebtedness with a thousand dollars of any currency, made a legal tender by law, what amount of such currency will discharge it? Who is to ascertain the amount which will be required? And by what means is it to be ascertained? By what market or standard can it be ascertained? Is the court pronouncing the judgment to say it may be discharged by the payment of one amount of one kind of legal currency, and by a different amount of another kind of legal currency? What law authorizes any such judgment? If the court is not to do it, is the collecting officer to determine this? And, if so, is he to hear the conflicting evidence of witnesses and be governed by the conflicting values of different markets; or how is he to arrive at just and certain conclusions? And is he to judge at his peril, or is he to be wholly irresponsible? Is his judgment to be final, or subject to revision? And if subject to revision, by what mode of operation and by what forum?

These questions are suggestive of the absurdity of departing from the harmonious, simple, and uniform rule of the Constitution and the laws, to regard dollars, declared by law to be a legal tender, of the same exact value, whether of coin or paper, regardless of the market value of either or both. With this rule the duties of courts and collecting officers are simple, first for the courts to ascertain how many dollars are to be paid, and then for the collecting officer to ascertain whether the currency offered is of either kind made by law a legal tender.

Much light has been shed upon this subject by the able opinions of Judges Daviess, Balcom, Wright, Emmott, and Marvin, of the appellate court of New York, in the case of

*Meyer vs. Roosevelt, and other cases tried at the same time;* and by the United States court of claims, *opinion by Chief Justice Casey, in Latham vs. United States, March* 6, 1865.

Respect for the legal learning and integrity of my two colleagues, Peters and Robertson, would have made it agreeable to concur with them, but for my own conscientious convictions that this act was but the exercise of constitutional power by Congress. The disagreeable necessity of dissenting from their opinion is, however, to some extent, relieved, when I reflect that the constitutionality of this act was upheld by the experienced and able circuit judge who presides over the 13th district, in one case, and by that learned jurist, the venerable chancellor of the Louisville chancery court, in two other cases now before this court.