### Rhea, Treasurer v. Newman, et al.

(Decided May 7, 1913.)

### Appeal from Franklin Circuit Court.

1. Officers—When Ministerial Officer May Refuse to Act.—Where a valid law requires a State officer to act, although the act be ministerial merely, if he is directly responsible for his official acts, he may refuse to act, if in his judgment, to do so would violate some constitutional provision; and, in case proceedings are instituted to coerce him, he may set up the constitutional prohibition as a defense.

2. Constitutional Law—Ordinary State Expenses.—The provision of section 49 of the Constitution which prohibits the Legislature from contracting debts in excess of $500,000, does not apply to the ordinary expenses of the State government.

3. State—Appropriation by Legislature May Anticipate Revenue.— It is not essential to the validity of an appropriation that funds to meet it should be in the treasury at the time the appropriation is made; an appropriation may be made by the Legislature in anticipation of the receipt of the yearly revenue.

4. Constitutional Law—Power of Legislature.—It is not essential to the validity of State legislation that there should be express warrant for it in the Constitution, since the well established principle controlling a State Legislature is, that it has authority to pass such laws as are not prohibited by the Constitution

5. Legislature—Powers of State—Of Municipalities.—The radical difference between the powers of the State and the powers of a municipality to contract debts is strongly marked, since under

the Constitution the debt creating power and the taxing power of a State is unlimited, while those powers with respect to a municipality are limited and confined within prescribed bounds.

6. Appropriation—When a Debt—Character of.—Whether an appropriation is a debt within the meaning of section 49 of the Constitution, which prohibits the Legislature from creating debts in excess of $500,000, depends upon the character of the appropriation and the manner of its payment.

7. Appropriation—When a Debt.—An appropriation which merely authorizes the payment of a gratuity, or is made in support of one of the State institutions, or to create or maintain a useful arm of the State government, or to defray the ordinary or current expenses of the State, does not constitute a debt such as is prohibited by section 49 of the Constitution.

8. State Fair—Appropriation to, Not a Debt.—An appropriation made by the Legislature in aid of the State Fair, which is owned and conducted by the State, is an appropriation for the ordinary expenses of the government, and does not fall within the prohibition found in section 49 of the Constitution, which prohibits the Legislature from creating debts in excess of $500,000.

9. Appropriation—Interest-Bearing Warrant.—Where the issuance of a warrant by the State Auditor created no unconstitutional debt, an endorsement made pursuant to a statutory requirement that the warrant shall be endorsed "interest bearing" after its presentment and non-payment, does not change the character of the warrant.

10. Treasurer—Duty in Paying Warrants.—It is the duty of the State Treasurer to pay outstanding warrants in the order they were issued, and as the money available for the purpose reaches the treasury.

JAMES GARNETT, Attorney General for appellant.

A. J. CARROLL and W. W. CRAWFORD for appellee

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This action was brought by the Kentucky State Fair, through J. W. Newman, its chairman, to compel Thomas S. Rhea, the State Treasurer, by a writ of mandamus, to endorse certain warrants issued by the Auditor of Public Accounts, so that they would thereby become interest-bearing warrants. Briefly stated, the facts are as follows:

By an act approved March 19, 1912, the General Assembly appropriated the sum of $30,000 "out of any money in the treasury and not otherwise appropriated, for paying off the present indebtedness of the Kentucky State Fair." Acts 1912, p. 541.

On November 12, 1912, the Auditor of Public Accounts issued to the plaintiff, John W. Newman, Commissioner of Agriculture, Labor and Statistics of the State of Kentucky, who, by virtue of his office is chairman of the State Board of Agriculture, which conducts the Kentucky State Fair, five warrants upon the State Treasurer, for $5,000 each, in payment of $25,000 of said appropriation. A warrant for the other $5,000 had been previously issued. Chairman Newman presented said five warrants to the appellant, Thomas S. Rhea, State Treasurer, for payment, but Rhea refused to pay any of said warrants because the funds available for their payment had been exhausted. Thereupon the appellee demanded of appellant that he endorse said warrants as interest-bearing from that date, as provided by section 3 of the Act of 1910, which reads as follows:

"Whenever any warrant hereafter issued by the Auditor of Public Accounts shall be presented to the Treasurer for redemption, and the funds appropriated for the purpose for which said warrant was issued are exhausted, the Treasurer shall endorse thereon the date of its present presentation with the words, 'No funds with which to pay this warrant, and it bears five per cent interest from this date until called in,' with his official signature thereto, and such warrant shall thereafter 'bear interest at the rate of five per cent per annum, payable semi-annually.' " Acts 1910, p. 218.

The Treasurer having refused to make said endorsement upon said warrants, Newman, as Commissioner of Agriculture, Labor and Statistics, instituted this action on January 14, 1913, against Rhea, the Treasurer, praying for a writ of mandamus commanding him to endorse said warrants, and each of them, as required by law, so that they shall bear interest until paid.

Rhea answered giving the specific data relating to the revenue and expenses of the State government for the years 1912 and 1913, up to the time he answered, and the probable income and expenses for the remainder of the year 1913, estimated upon the basis of the income and expenses of preceding years, showing that at the time of the appropriation to the State Fair, there were outstanding warrants against the Commonwealth amounting to more than one million dollars; that at the date the Auditor issued said warrants there were outstanding warrants against the State amounting to more than two million dollars; that at the time of the approval of said Act making

said appropriation, and continuously thereafter, there had been, and was at the time the answer was filed, a deficit in the State treasury in excess of $500,000; and, that said warrants were void, because at the time they were issued the indebtedness of the Commonwealth, created by the Legislature exceeded the sum of $500,000, the limit provided by section 49 of the Constitution.

A demurrer having been sustained to the answer, and the writ of mandamus ordered pursuant to that ruling, Rhea prosecutes this appeal.

Before taking up the principal question, however, we will dispose of the preliminary question presented in appellee's contention that since the duties of the State Treasurer are purely ministerial, he cannot raise the question of the validity of the warrants; and that he cannot call in question the act of the Auditor in issuing them. This question was considered at great length in the late case of State ex rel v. Candland, 36 Utah, 417, where the court after reviewing the authorities, summed up its conclusions as follows:

"We think a careful perusal of the authorities will disclose that while some of the cases contain general expressions which would seem to indicate that an officer in a mandamus proceeding against himself, requiring him to do a ministerial act, may not justify his failure to act upon the sole ground that the law directing the act is unconstitutional, the direct question now before us was not really involved in those cases. Where the question whether an officer acting ministerially, who is directly responsible for his official acts, may attack a law in a mandamus proceeding, was actually before the courts, the great weight of authority is to the effect that such an officer may, in such a proceeding, justify his refusal to act upon the ground that the law requiring the act is unconstitutional. The following well-considered cases leave little, if any, room for doubt or controversy upon this question. (Van Horn v. State, 46 Neb., 62, 64 N. W., 365; Norman v. Kentucky Board of Examiners, etc., 93 Ky., 537, 20 S. W., 901, 18 L. R. A., 556; McDermott .v Dinnie, 6 N. Dak., 278, 69 N. W., 294; Denman v. Broderick, 111 Cal., 97, 43 Pac., 516; Brandenstein v. Hoke, 101 Cal., 131, 35 Pac., 562.)

"When the law requires an officer to act, although the act be ministerial merely, if he is directly responsible for his official acts he may refuse to act, if in his judgment the law is in conflict with some constitutional provision,

and, in case proceedings are instituted to coerce him, he may set up the supposed defect in the law as a defense. No other conclusion is permissible, if the Constitution is the supreme law, and if legislative acts in conflict therewith are not merely voidable but are absolutely void. A legislative act which is in conflict with the Constitution is stillborn and of no force or effect—impotent alike to confer rights or to afford protection. This general doctrine is adopted by the courts generally and is the doctrine promulgated by the Supreme Court of the United States, as appears from the case of Norton v. Shelby County, 118 U. S., 442, 6 Sup. Ct., 1125 (30 L. Ed. 178), where Mr. Justice Field, in speaking for the court, says: 'An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.'

"If this be true, how can any officer, who is responsible for his official acts and who has taken the required oath of office that he 'will support, obey and defend' the Constitution of the State, justify any act which in his judgment is contrary to or is forbidden by the Constitution, and which is in fact so, although the act be required of him by some legislative enactment? The fact that the act required at his hands is merely ministerial does not change the effect so far as the officer is concerned. If the legislative enactment under which he is required to act is in conflict with the Constitution, the Constitution and not the enactment prevails, and the officer must obey the Constitution or violate his oath of office."

It is true the language above quoted refers to an unconstitutional enactment of the Legislature; but if a constitutional act of the Legislature requires the Treasurer to perform an act which is ordinarily within the line of his duty, but is, in the particular instance, a violation of the Constitution, he is equally bound to refuse performance, although the law under which he refuses to act is constitutional.

The Treasurer does not contend in the case at bar, that the Legislature did not have the power to direct State warrants to be endorsed as interest-bearing, as it did by the Act of 1910, or that the law imposing that duty upon him was not properly enacted; he only claims that at the time the warrants were presented by the appellee, the Act had ceased to operate upon him because the indebtedness of the State had exceeded the constitu-

tional limit. As the Treasurer gives a heavy bond, and takes an oath to support the Constitution of the Commonwealth, his duties in the present case were more than merely ministerial; and, in our opinion he had the right to raise the question as to the legality of the act demanded of him.

The decision of the case upon its merits presents a more difficult question, and depends upon the construction to be given section 49 of the Constitution of Kentucky, which reads as follows:

"The General Assembly may contract debts to meet casual deficits or failures in the revenue; but such debts, direct or contingent, singly or in the aggregate, shall not at any time exceed five hundred thousand dollars, and the moneys arising from loans creating such debts shall be applied only to the purpose or purposes for which they were obtained, or to repay such debts: Provided, The General Assembly may contract debts to repel invasion, suppress insurrection, or, if hostilities are threatened, provide for the public defense."

And, although section 50 of the Constitution has no direct bearing upon the question before us, it may profitably be read in connection with section 49. It reads as follows:

"No act of the General Assembly shall authorize any debt to be contracted on behalf of the Commonwealth except for the purposes mentioned in section forty-nine, unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it; *Provided,* The General Assembly may contract debts by borrowing money to pay any part of the debt of the State, without submission to the people, and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon."

Section 171 of the Constitution makes it the duty of the General Assembly to provide an annual tax sufficient to defray the expenses of the Commonwealth, in the following terms:

"The General Assembly shall provide by law an annual tax, which, with other resources, shall be sufficient to defray the estimated expenses of the Commonwealth

for each fiscal year. Taxes shall be levied and collected for public purposes only. They shall be uniform upon all property subject to taxation within the territorial limits of the authority levying the tax; and all taxes shall be levied and collected by general laws."

Section 49, *supra,* is taken bodily from the Constitution of 1850; and although it has thus been standing in the fundamental law of the State for more than half a century, the precise question now presented is before us for the first time.

In speaking of the history of this section in James, Auditor v. State University, 131 Ky., 170, we said:

"It yet remains to consider the fourth and final contention of appellant, which is that payment of the appropriations claimed would create a debt against the State of more than $500,000 in excess of its revenues, which would be violative of the provisions of sections 49 and 50 of the Constitution. Sections 49 and 50 were a part of the Constitution of 1850. At that time the State was greatly in debt on account of internal improvements, and the proceedings and debates of the convention which framed that instrument prove that the sections in question were adopted for the purpose of restraining the Legislature from further indulgence in reckless investment of the State's money and credit in internal improvements. Looking to the contemporaneous practical construction of these two sections of the Constitution for guidance in arriving at a solution of the questions raised by appellant's final contention, we find that the Legislature has since the adoption of the present Constitution passed like acts to that under consideration appropriating large sums of money to such institutions as appellees, which have been approved by the sinking fund commissioners and other executive boards of the State, and audited and paid by its ministerial officers without doubt or question."

In arriving at a proper construction of said section, we must consider the reason for the provision and the purpose of the convention in adopting it; and in that consideration it is proper to read in connection with section 49, the other provisions of the Constitution bearing either directly or indirectly upon the question. As above pointed out, section 171 requires the General Assembly to provide an annual tax which shall be sufficient to defray the ordinary expenses of the State; sec-

tion 49 empowers the Legislature to contract debts to the extent of five hundred thousand dollars; while section 50 makes a further provision for the borrowing of money upon a vote of the people, and requires the levy of a tax sufficient to pay the principal and interest within thirty years. These provisions, when read together, constitute a sound business rule for the conduct of the State's finances. It needs no argument to demonstrate the soundness of the elementary proposition that the State should live within its income—year by year. The yearly income can be approximately estimated; and whenever the Legislature concludes to exceed those revenues in its appropriations of money, not only good business methods but the very terms of the Constitution, which its members have sworn to support, require it to levy an additional tax to meet the additional appropriation. And the fact that section 49 permits the Legislature to contract debts not exceeding $500,000 to meet casual deficits or failures in the revenue, does not relieve that body of its constitutional duty, which is based upon the soundest of business principles, of providing, by increasing the tax rate whenever necessary, an annual revenue sufficient to pay the annual expenditure of the State.

But should the Legislature fail in its plain duty under section 171, by refusing to levy any tax whatever, should the State cease to govern? Would its courts of justice, and its penal and charitable institutions close their doors? Would its peace officers, for want of support, be compelled to turn the State over to the passions of the lawless and vicious elements? Would the Legislature be incapable of incurring the expense of a session, and therefore be unable to meet, even though the meeting were called for the sole purpose of levying the necessary tax to pay the running expenses of the State? No one would hesitate to answer these questions in the negative. Considerations of this character have necessarily led to the recognition and adoption of certain elementary canons of construction, which are peculiarly applicable to the interpretation of constitutional provisions, and especially to constitutional prohibitions.

Thus, in Hager, Auditor v. Gast, 119 Ky., 507, where the statute provided that the Auditor should draw his warrant for the cost of paving a street abutting upon State land, and the Auditor declined to do so upon the ground that he statute directing the payment was in con-

flict with sections 49 and 50 of the Constitution, this court said:

"Lastly, it is urged that the act is in conflict with sections 49, 50 of the Constitution which forbid the General Assembly authorizing any debt to be contracted on behalf of the Commonwealth except for certain specified purposes. But these sections of the Constitution have been the organic law of the State since 1851 (see sections 35, 36, art. 2, of former Constitution), and under it this court sustained such legislation. Lindsey v. Auditor, 3 Bush, 231; Commonwealth v. Collins, 12 Bush, 386; Auditor v. Haycraft, 14 Bush, 284. *These provisions of the Constitution do not embrace the ordinary expenses of the government.* The State may repair its Blind Institute, or build a road to it to make it more accessible, or conduct its ordinary affairs without making a special levy for this purpose."

Clearly, the conclusion reached by the court that the prohibition of section 49 did not embrace the ordinary expenses of the government; is sound, since, under no view of the case, can it be believed that the convention ever contemplated that a state of affairs could arise where the State government must stop for want of cash to pay the ordinary expenses of the government. All the executive and judicial officers of the state, its many penal and charitable institutions, its public schools and State University, and its other public institutions, too numerous to mention, must be maintained, regardless of the condition of the treasury. The machinery of government provided by the Constitution for the protection of all the people of the State must not cease operating merely because a majority of the members of some particular Legislature might be so unmindful of their oaths of office as to neglect to provide an adequate revenue. These considerations necessarily led to the adoption of the rule above pointed out, that the prohibition of section 49 does not apply to the ordinary expenses of the government. See also Carter v. Thorson, 5 S. D., 474; 49 Am. St. Rep., 893.

Again, in Eastern Kentucky Lunatic Asylum v. Bradley, 101 Ky., 551, it was further held that the prohibition found in section 49 did not apply to debts existing at the time the Constitution was adopted, and that a former floating indebtedness of the State in excess of

$500,000 might be bonded by the Legislature, without a vote of the people.

Furthermore, revenues of the State, assessed and in process of collection, may be considered as constructively in the treasury, and may be appropriated and treated as though actually and physically there; and an appropriation of them by the Legislature does not constitute the incurring of an indebetdness within the meaning of section 49 of the Constitution.

In McCauley v. Brooks, 16 Cal., 28, Chief Justice Field, said:

"To an appropriation within the meaning of the Constitution nothing more is requisite than a designation of the amount, and the fund out of which it shall be paid. It is not essential to its validity that funds to meet the same should be at the time in the treasury. As a matter of fact, there have seldom been in the treasury the necessary funds to meet the several amounts appropriated under the general appropriation acts of each year. The appropriation is made in anticipation of the receipt of the yearly revenues. It constitutes indeed the authority of the Controller to draw his warrants, and the Treasurer, when in funds, to pay the same, and that is all."

To the same effect, see State v. McCauley, 15 Cal., 455; Koppicus v. State Capitol Commissioners, 16 Cal., 253; The People v. Pacheco, 27 Cal., 175; Ingram v. Colgan, 106 Cal., 113; 46 Am. St. Rep., 221; Ash v. Parkinson, 5 Nev., 16; In Re The Incurring of State Debts, 19 R. I., 613; In re State Warrants, 6 S. D., 518, 55 Am. St. Rep., 852.

Bearing these general principles and exceptions to the general rule in mind, let us now consider this question: Is an appropriation a debt within the meaning of section 49 of the Constitution? It is well settled that a State Constitution is not a grant of legislative powers. "The Legislature has all power, unless restricted by the Constitution." Scott v. McCreary, 148 Ky., 791; See also, note to People v. Freeman, 13 Am. St. Rep., 126; Lawton v. Steele, 119 N. Y., 226; 16 Am. St. Rep., 813; Carter v. Thorson, 5 S. D., 474; Am. St. Rep., 893.

The rule was announced in Banks v. Commonwealth, 145 Ky., 803, to be as follows:

"It is not at all essential to the validity of legislation that there should be express warrant for it in the Constitution. The well established principle controll-

ing the State Legislature is that it has authority to pass such laws as are not prohibited by the Constitution. When there is no constitutional limitation upon its authority, the Legislature may act. Griswold v. Hepburn, 2 Duv., 20; L. & N. R. R. Co. v. Herndon, 126 Ky., 589.''

It will be noticed that the Constitution nowhere restricts the debt-creating power of the state; at most, it merely regulates the method of using the power. The radical difference between the powers of the State and the powers of municipalities to contract debts is strongly marked. The Constitution places a limit upon the debt-creating power and upon the taxing power of municipalities, and when that limit is exceeded, the debt constitutes no debt whatever against the municipality, for want of power to create it. It is otherwise, however, with the State, which, being the sovereign political power, may create debts without limit, and has an unlimited taxing power for use in the discharge of the debt. The only regulations put upon the State's power to create a debt are found in sections 49 and 50, *supra;* the first of said sections providing that the Legislature alone may create an indebtedness of $500,000; and any indebtedness beyond that limit must, under section 50, have the approval of the people at a general election, and a specific tax levied for its payment. On the other hand, section 158 of the Constitution peremptorily prohibits municipalities from incurring an indebtedness beyond a prescribed limit; it cannot be done in any way; the power is wanting. It is this broad and radical distinction between the powers of a State and the powers of a municipality which makes the adjudications in cases of municipal indebtedness—like Beard v. Hopkinsville, 95 Ky., 239, 23 L. R. A., 402, and O'Bryan v. City of Owensboro, 113 Ky., 680—of little aid in discussing the question of the State's power to create debts.

It is contended that a careful reading of section 49 shows that it contemplates a formal borrowing of money by the Legislature, and not a mere appropriation, since it requires that ''the moneys arising from *loans creating* such debts shall be applied only to the purpose or purposes for which they were obtained, or to repay such debts.''

In Eastern Kentucky Lunatic Asylum v. Bradley, 101 Ky., 551, the only case in which this court has passed

upon the power of the Legislature to borrow money in excess of $500,000, the debt was contracted by issuing bonds of the State. It could not have been intelligently done otherwise, since the Constitution requires a legislative provision for a tax levy sufficient to pay the interest and the debt within thirty years. These requirements necessarily contemplate the raising of definite amounts of interest as well as principal, and they could not be intelligently applied to indefinite or varying sums, which usually make up a floating debt.

It must be admitted there is force in the argument; and there are expressions found in the recent opinions of this court, which would seem to sustain it, at least, in a measure.

In James, Auditor v. State University, 131 Ky., 173, the Legislature had appropriated a large sum of money for the erection and equipment of new buildings for the State University, and the Auditor refused to issue his warrants, because in making that appropriation, the Legislature had passed the limit provided by section 49 of the Constitution. But, in overruling that contention by the Auditor, this court said:

"It is, we think, further manifest that appropriations such as these cannot fairly be said to create an indebtedness against the Commonwealth, for they may be discontinued, reduced, or changed at the pleasure of the Legislature, or that body might, at its next session repeal the act as to so much of the appropriations as would then remain unpaid; but these things could not be done if the appropriation were a debt."

The same doctrine had theretofore been announced in Hager, Auditor v. Kentucky Childrens' Home Society, 119 Ky., 235, 67 L. R. A., 875, where the court, having under advisement the constitutionality of an act appropriating $15,000 to the Kentucky Childrens' Home Society, said:

"Nor does this appropriation create an indebtedness against the Commonwealth. It may be discontinued, reduced, or changed at the pleasure of the Legislature, which could not be done if it were a debt. It is a gratuity, just as the present provision for the support of the insane and idiots is, which may be altered both as to the amount and manner of application, at the pleasure of the law-making body."

The distinction here pointed out by the court as to the legal nature and effect of an appropriation is neces-

sarily sound, for, when we speak of one being indebted, we contemplate the state of his being under obligation to make payment, as of money or services, to another.

We do not mean to be understood as saying that an appropriation may not constitute a debt. It may be of such a character as to have all the essential elements of a contract, and in such a case unquestionably it would be a debt; but under the authorities quoted above, an appropriation which merely authorizes the payment of a gratuity, or is made in support of one of the State institutions, or to create or maintain a useful arm of the State government, or to defray the ordinary or current expenses of the State, does not constitute a debt such as is prohibited by section 49 of the Constitution. This view is fully sustained by the language of this court in James, Auditor v. State University, *supra,* where, after a full consideration of the question, we reached the following conclusion:

"Whether, therefore, an appropriation is a debt in the meaning of sections 49 and 50 of the Constitution, must depend upon the character of the appropriation, and the manner of its payment."

In view of these conclusions as to the purpose of section 49 of the Constitution, and the excepting from its provisions appropriations for the ordinary expenses of the government, and debts existing prior to its adoption, it necessarily follows, as we said in James, Auditor v. State University, *supra,* that the validity of an appropriation of money by the Legislature beyond the limit of $500,000 prescribed by the Constitution, must depend in each case upon the character of the appropriation, or the manner of its payment. If its payment runs over a period of years, and the part payable in any one year would not exceed the $500,000 limit, then such an appropriation would not contravene the constitutional provision, regardless of its character. If, however, the appropriation, when added to prior like appropriations, exceeds the constitutional limit of $500,000, its character must be considered in order to determine whether it comes within the class of appropriations which do not constitute debts and are, for that reason, excluded from the operation of section 49. If the Legislature should borrow or appropriate a hundred thousand dollars for some purpose other than the ordinary expenses of the government, and the amount thus borrowed or appro-

priated would carry the indebtedness of the State beyond the constitutional limit, the act would be unauthorized; but, when it appropriates money for the purpose of maintaining some one or more of the State institutions, or to create or maintain a useful arm of the State government, or to defray the ordinary or current expenses of the State, it is acting strictly within the rule laid down in the Gast case, and section 49 of the Constitution does not apply.

There is no difference, in principle, between a general act fixing the salaries of officers and employees and the maintenance of the inmates of the public institutions, from an act making a special appropriation to pay the indebtedness of any one of those public institutions. Such is the case at bar. The appropriation in this case was made for the purpose of paying the debts of the State Fair. The State Fair is one of the great institutions of the State. It was created for the purpose of improving and educating the people of the State along highly important lines. and no one will, or can successfully contend, that the State Fair is not one of the most important and essential adjuncts of the State Government.

In these times of greatly increased population and the consequent increased demands for the products of the soil, no other line of business activity conduces as much to the public prosperity  as improved farming methods.  In order to keep abreast of the times  our farmers must use the most approved methods, and the easiest way to induce them to do this, is by causing them to see and thus become interested in what others are doing.  The State Fair is an established State institution, and, like its schools and its penal and charitable institutions, must be maintained by the State, if it is to live.

By its act, the Legislature directed $30,000 to be paid to the State Fair. But the fact that the money was not in the treasury when the warrants were presented did not affect their validity, since they will be paid by the Treasurer when the money comes in, in the due course of the revenues. In the meantime, the Legislature has provided that these warrants, if not paid upon presentation, shall be made "interest bearing." We are not to question the wisdom of the Legislature in making that provision, but only to consider its power to so do; and that it has the power, there can be no question.

Neither can it be said that the provision for interest makes an appropriation a debt if it were not otherwise

so. That question was expressly raised and decided, in the negative, by the judges of the Supreme Court of South Dakota in, "*In re* State Warrants," 6 S. Dak., 518, 55 Am. St. Rep., 857, where they said:

"It may be suggested that the warrants authorized by this law will draw interest, and to that extent, if no more, an objectionable indebtedness is incurred; but, in respect to interest, the warrants authorized by this law are not different from those which we have already seen may properly be drawn and issued. If the issuance of the warrant creates no unconstitutional debt, how can the incident of interest, which the statute imposes as a compensation or allowance for delay, make that an unconstitutional debt which was not so before?"

See, also, Ash v. Parkinson, 5 Nev., 15, to the same effect.

We find no constitutional objection, therefore, to the Act of 1910, which requires the Treasurer to endorse warrants as interest bearing, in case there are no funds on hand to pay them upon presentment.

It is the duty of the Treasurer to pay outstanding warrants in the order they were issued, and as the money available for the purpose reaches the treasury. This practice insures fair treatment of all, alike.

And, since in the case at bar the warrants were issued for a legitimate portion of the current expenses of a State institution, and are not, under the rule herein announced, to be included within the prohibition of section 49 of the Constitution, the Chancellor's judgment requiring the appellant to endorse them as interest bearing, was proper.

Judgment affirmed: the whole court sitting.