STATE OF NORTH DAKOTA EX REL. WILLIAM LANGER, Attorney General, Petitioner, v. THOMAS HALL, as Secretary of State, Respondent.

(173 N. W. 763.)

**States — bond issues — limit of indebtedness — constitutional provisions.**

1. Section 182 of the Constitution as amended construed, and *held* to authorize the issue of $2,000,000 of bonded indebtedness, unsecured except by the faith and credit of the state of North Dakota, in addition to $412,000 of existing bonded indebtedness.

**Mandamus — grounds — certification of bond as within debt limit.**

2. Thomas Hall, as secretary of state having refused to attest and certify that certain bonds in the sum of $2,000,000, issued pursuant to law by the governor and treasurer of the state of North Dakota, were within the debt limit, a petition was presented to this court on behalf of the state that a writ of mandamus issue out of this court requiring and commanding him to do so. *Held*, that it is proper that the writ of mandamus should issue in this case.

(Opinion filed June 14, 1919.)

*Wm. Langer,* Attorney General, *Geo. K. Foster,* Assistant Attorney General, and *Albert E. Sheets, Jr.* Assistant Attorney General, for petitioner.

*W. H. Stutsman,* for respondent.

GRACE, J. This is an application to this court for an alternative writ of mandamus against Thomas Hall as secretary of state of the state of North Dakota, demanding and directing him to attest and certify to certain bonds. A preliminary statement of the matters involved in the petition will aid in understanding the issues involved.

It is provided by § 187 of the Constitution of the state of North Dakota that no bond nor evidence of indebtedness of the state shall be valid unless the same shall have indorsed thereon a certificate which shall be signed by the auditor and secretary of state, which shall show that the bond or evidence of debt is issued pursuant to law and is with-

NOTE.—The question of mandamus to compel issuance of bonds of municipality or other public corporation is discussed in a note in L.R.A.1916C, 414.

in the debt limit. Section 182 of the Constitution of the state of North Dakota as it originally was enacted and before its amendment was as follows:

"The state may, to meet casual deficits or failure in the revenue or in case of extraordinary emergencies, contract debts, but such debts shall never in the aggregate exceed the sum of $200,000 exclusive of what may be the debt of North Dakota at the time of the adoption of this Constitution. Every such debt shall be authorized by law for certain purposes to be definitely mentioned therein, and every such law shall provide for levying an annual tax sufficient to pay the interest semiannually, and the principal within thirty years from the passage of such law, and shall specifically appropriate the proceeds of such tax to the payment of said principal and interest and such appropriation shall not be repealed nor the tax discontinued until such debt, both principal and interest, shall have been fully paid. No debt in excess of the limit named shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war, or to provide for public defense in case of threatened hostilities; but the issuing of new bonds to refund existing indebtedness shall not be construed to be any part or portion of said $200,000."

Section 182 as it now stands after being amended is as follows:

"The state may issue or guarantee the payment of bonds, provided that all bonds in excess of $2,000,000 shall be secured by first mortgages upon real estate in amounts not to exceed one half of its value; or upon real and personal property of state-owned utilities, enterprises, or industries, in amounts not exceeding its value and provided further that the state shall not issue or guarantee bonds upon the property of state-owned utilities, enterprises, or industries in excess of $10,000,000. No further indebtedness shall be incurred by the state unless evidenced by bond issue which shall be authorized by law for certain purposes to be clearly defined. Every law authorizing a bond issue shall provide for levying an annual tax or make other provision sufficient to pay the interest semiannually and the principal within thirty years from the passage of such law and shall specially appropriate the proceeds of such tax or of such other provisions to the payment of said principal and interest and such appropriation shall not be repealed or the tax or

other provisions discontinued until such debt, both principal and interest, shall have been paid.   No debt in excess of the limit named herein shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war, or to provide for the public defense in case of threatened hostilities."

The legislature of 1919 passed House Bill No. 49, which was an act providing for the issuing of bonds of the state of North Dakota in the sum of $2,000,000 to be known as "Bonds of North Dakota Bank Series;" such acts prescribed the terms and stated the purposes of the bonds.   It provided a tax and made other provisions for the payment thereof.   It made appropriations for the payment of said bonds and to carry into effect the provisions of the act and declared the act to be an emergency measure.   Section 1 of said act is as follows:

"The state treasurer is hereby directed forthwith to prepare for issue and the governor and the state treasurer are hereby authorized, empowered, and directed to issue negotiable bonds of the state of North Dakota in the aggregate amount of $2,000,000.   They shall be issued by the governor and the state treasurer under the great seal of the state and shall be attested by the secretary of state.   The auditor and secretary of state shall indorse and sign on each bond a certificate showing that it is issued pursuant to law and is within the debt limit.   The bonds so issued shall be designated "Bonds of North Dakota Bank Series."

The state treasurer of the state of North Dakota prepared the bonds for issue.   The governor and the state treasurer of the state of North Dakota authorized and directed that there be issued said bonds of the state of North Dakota in the aggregate amount of $2,000,000 and in pursuance of such direction and authorization the governor and state treasurer of the state of North Dakota have each executed said bonds in accordance with the provisions of said law.   On the 26th day of May, 1919, in compliance with the requirements of the law, the bonds in question were presented to Thomas Hall, secretary of state, for the purpose of obtaining the attestation and certification on each bond showing that the same was issued pursuant to law and was within the debt limit as is required by § 1 of the law in question and as required by § 182 of the state of North Dakota as amended.   Thomas Hall, as

secretary of state of the state of North Dakota has failed, neglected, and refused to attest and certify said bonds as required by the law in question and the Constitution as amended, and continues at this time to refuse to do so.

It is clear that it will be necessary for this court to construe § 182 of the organic law as amended or so much thereof as is material to the matters at issue herein and also necessary to construe the law known as House Bill No. 49 relating to bonds of North Dakota. The law in question is based upon said § 182 of the organic law as amended. It is conceded that prior to the passage of the act in question there was an outstanding bonded indebtedness of the state of North Dakota of approximately $412,000. The contention of Hall is that the meaning of the act and of § 182 of the Constitution as amended is that the state may issue or guarantee the payment of bonds to the extent of $2,000,000 without such bonds being secured otherwise than by the faith and credit of the state of North Dakota; that there should be deducted from said $2,000,000 the outstanding bonded indebtedness for the state of North Dakota, approximately the sum of $412,000 leaving a balance of $1,588,000 in bonds which could be issued by the state of North Dakota pursuant to the act under consideration and § 181 of the Constitution as amended and that as to such balance he conceded in oral argument before this court he is ready and willing to make the proper attestation and certification as required by the act in question. He contends in his brief, however, that the proposed issue of $2,000,000 of unsecured bonds is wholly illegal, in that the act providing for the creation of the Bank of North Dakota authorizes the Bank of North Dakota to begin doing business only when bonds to that amount are deposited with the industrial commission for that purpose; that after the deduction of $412,000 of bonded indebtedness theretofore existing which he claimed must be deducted from the proposed $2,000,000 unsecured bond issue, there will not be $2,000,000 of unsecured bonds to deposit with said bank. The state, however, contends it has the right under said act to issue bonds to the extent of $2,000,000, unsecured except by the faith and credit of the state, exclusive of or in addition to the $412,000, the present bonded indebtedness.

In so far as Hall as secretary of state declined to sign the bonds in

question in excess of $1,588,000 in the belief and conviction that the amount of bonds last mentioned was all that could legally be issued when there was added to that amount the bonded indebtedness theretofore existing of $412,000, and he further believed and had conviction in his own mind that the $1,588,000 of said bonds was all that could be issued within the debt limits above referred to, and if he acted upon such belief and conviction he was acting in good faith in refusing to sign bonds in excess of that amount. If he refused to sign any of said bonds though he might legally have signed $1,588,000 of such bonds, all of which under his own theory of the case and as he conceded in oral argument would be within the debt limit, it cannot be said he exercised good faith. If he declined to sign all the bonds on the theory advanced in his brief that the proposed issue of $2,000,000 of unsecured bonds is wholly illegal in that the Bank of North Dakota could not begin doing business until $2,000,000 had been deposited with the industrial commission for that purpose, and that there would not be $2,000,000 for that purpose after deducting $412,000 of existing bonded indebtedness, he was not then acting in good faith. It was no part of his executive duties as secretary of state to determine under what conditions the Bank of North Dakota might be legally qualified to commence business. It is true there must be $2,000,000 of bonds deposited with the industrial commission for that purpose before the Bank of North Dakota can commence business. The law does not say, however, that all of such bonds shall be deposited at one time. The limitation is that they shall be deposited before the bank commences business. The $1,588,000 of bonds that Hall concedes he is ready and willing to certify are within the debt limit, and thus were good, sufficient, and legal bonds, while not enough in amount under defendant's theory to authorize the Bank of North Dakota to commence business, were nevertheless valid bonds to be deposited with the industrial commission for that purpose, and if those bonds were within the debt limit and this, defendant concedes, he could not conscientiously and in good faith decline to attest and certify them as required by law. The fact that the amount of bonds which under his theory he could legally certify as within the debt limit was less than $2,000,000, could in no manner justify his refusal to place his certificate thereon as required

by law upon all the bonds which under his theory he concedes are within the debt limit.

Hall appears to have had two theories, viz.: that the proposed bond issue would not be wholly void, but was void only as to the bonds in excess of $1,588,000. It must be conceded, therefore, that Hall knew at all times under this theory that he could legally attest and certify to $1,588,000 of the bonds. He conceded in the argument before this court that he was willing to do so. He never did at any time sign the amount of bonds which he now claims he is willing to sign, and which under that theory he could legally sign. His other theory is that all of the proposed $2,000,000 issue of bonds was void as the bonds which could be legally issued under his theory did not amount to $2,000,000, the amount required before the Bank of North Dakota could commence business. He had refused to sign any bonds until the time the matter was presented to this court, at which time he conceded he would sign the bonds to the amount of $1,588,000.

The main question to be determined in this case is: What is the debt limit under § 182 of the Constitution as amended? The state contends it is $2,000,000 in addition to the existing bonded indebtedness. The defendant contends it is $2,000,000 less $412,000 of existing bonded indebtedness.

After careful and painstaking examination of the whole subject-matter of the controversy, we are firmly convinced that the contention of the state must be sustained. Every voter in the state who voted upon § 182 as amended must have understood and been cognizant of the existing indebtedness. There is nothing in the language of § 182 as amended to indicate that any of the then existing bonded indebtedness was to be deducted from or be considered as part of the $2,000,000. As we view the matter, the existing indebtedness was not intended to be included in § 182 as amended, there being no expressed statement to that effect included therein. In order to include existing indebtedness amended § 182 should have expressly so stated. It not having expressly so stated, we are of the opinion and so hold that the $2,000,000 of bonds which the state may issue or guarantee the payment of, are in addition to existing indebtedness. Eastern Kentucky Lunatic Asylum v. Bradley, 101 Ky. 551, 41 S. W. 556; Rhea v. Newman,

153 Ky. 604, 44 L.R.A.(N.S.) 989, 156 S. W. 154; Re Menefee, 22 Okla. 365, 97 Pac. 1014; 12 C. J. 714.

The language of the amended § 182 quite plainly indicates that the $2,000,000 bonded indebtedness in bonds which may be issued or guaranteed contemplated new contracts. The language referred to is as follows: "The state may issue or guarantee the payment of bonds provided that all bonds in excess of $2,000,000 shall be secured by first mortgages, etc."

The word "may" as used in said section indicates both permission and power to do the acts therein designated. We are impressed with the view that the meaning of that part of the section as a whole, which we have quoted, relates to future acts to be done by the state. Especially is this view convincing when contemporaneous history is taken into consideration and if resort may properly be had to contemporaneous history to aid in the construction of a law or constitutional requirement, there certainly never was a case to which it is more applicable than this. That there is a specific and well-understood economic program authorized by a large majority of the people to be carried out in this state, is well known or should be well known to every citizen of this state. Such a program has been authorized by several constitutional amendments as well as by the legislature. It is not at all necessary to state what the economic program is. It has been widely and persistently discussed in the press and from the platform by public speakers. The establishment of the Bank of North Dakota as a convenience and aid to assist in the initiating and carrying out of that program, constitutes an important element in accomplishing that result. It constitutes part of the machinery necessary to be used in the execution of the program. The execution of the program requires the use of large sums of money. The sixteenth legislature of North Dakota enacted the law providing for the creation of the Bank of North Dakota as an agency to facilitate and assist in carrying out that program. The purpose for which the bank is created is plainly stated in § 1 of the act creating it. Section 1 thereof is as follows: "For the purpose of encouraging and promoting agriculture, commerce and industry, the state of North Dakota shall engage in the business of banking and for that purpose shall and does hereby establish a system of banking

owned, controlled, and operated by it, under the name of the Bank of North Dakota." In it is required to be deposited all state, county, township, municipal, and school district funds and funds of penal, educational, and industrial institutions. It may make loans to counties, cities, or political subdivisions of the state or to state or national banks, but it may not loan or give its credit to any individual association or private corporation except that it may make loans to an individual association or private corporation secured by duly recorded first mortgage or real estate in the state of North Dakota in amounts not to exceed one half of the value of the security and it may loan upon warehouse receipts issued by the industrial commission or by any licensed warehouse within the state in amounts not to exceed 90 per cent of the value of the commodities evidenced thereby. It may not loan, however, on real estate more than 30 per cent of its capital nor 25 per cent of its deposits.

It will thus be seen that the state is establishing the Bank of North Dakota as a fiscal agency for the transaction of its own business and as a fiscal agent for other purposes. It becomes, therefore, an important agency and means of properly carrying out the economic program which has been authorized by the people, and is a means to safeguard the interest of the people and provides a safe depository for the funds in question, and one from which strict accountability may be required, as its accounts will be subject to the same examination, as any other private banking institution of this state, by public examiner.

In this view of the situation and the almost universal knowledge of the people of this state of the proposed economic program, we are convinced that the authorization of the $2,000,000 of bonds related exclusively to future acts and contracts, and did not include the existing bonded indebtedness. We are fully convinced that the people so understood and construed § 182 as amended at the time they voted for its adoption.

Another view which lends strength to the view which we have taken is found in the fact that the sixteenth legislative assembly which enacted House Bill 49 and House Bill 18, which is the bill authorizing the Bank of North Dakota, and in other legislation enacted by it which was intended to carry out the economic program in question, in effect,

construed § 182 as amended to mean that in addition to the existing bonded indebtedness, the state could issue $2,000,000 of bonds unsecured otherwise than by faith and credit of the state of North Dakota, and that $2,000,000 of bonds in excess of the existing bonded indebtedness could be issued, and they would be within the debt limit.

We are fully satisfied from the foregoing that the writ of mandamus should at once issue; that Thomas Hall as secretary of state should be required thereby to subscribe his name to each of said bonds in the manner required by law, and that he should be required to properly attest each of the bonds in question to the full amount thereof of $2,000,000; that he shall attach to each and all of said bonds his certificate that the same is issued pursuant to law and is within the debt limit of the state of Norh Dakota. It is so ordered.

BRONSON, J., concurs.

BIRDZELL, J. (concurring). In 1916–1917 the state Constitution was amended so that its provisions with respect to the public debt read as follows:

"Section 182. The state may issue or guarantee the payment of bonds provided that all bonds in excess of two million dollars shall be secured by first mortgages upon real estate in amounts not to exceed one half of its value; or upon real and personal property of state-owned utilities, enterprises or industries, in amounts not exceeding its value, and, provided further, that the state shall not issue or guarantee bonds upon property of state-owned utilities, enterprises, or industries in excess of ten million dollars.

"No future indebtedness shall be incurred by the state unless evidenced by a bond issue, which shall be authorized by law for certain purposes, to be clearly defined. Every law authorizing a bond issue shall provide for levying an annual tax, or make other provisions, sufficient to pay the interest semiannually, and the principal within thirty years from the passage of such law, and shall specially appropriate the proceeds of such tax, or of such other provisions, to the payment of said principal and interest, and such appropriation shall not be repealed nor the tax or other provisions discontinued until such debt,

both principal and interest, shall have been paid. No debt in excess of the limit named herein shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war, or to provide for the public defense in case of threatened hostilities.

"Section 183. The debt of any county, township, city, town, school district or any other political subdivision shall never exceed five per centum upon the assessed value of the taxable property therein; provided, that any incorporated city may, by a two-thirds vote, increase such indebtedness three per centum on such assessed value beyond said five per centum limit. In estimating the indebtedness which a city, county, township, school district or any other political subdivision may incur, *the entire amount of existing indebtedness, whether contracted prior or subsequent to the adoption of this Constitution shall be included:* provided, further, that any incorporated city may become indebted in any amount not exceeding four per centum on such assessed value without regard to the existing indebtedness of such city, for the purpose of constructing or purchasing waterworks for furnishing a supply of water to the inhabitants of such city, or for the purpose of constructing sewers and for no other purpose whatever. All bonds or obligations in excess of the amount of indebtedness permitted by this Constitution, given by any city, county, township, town, school district, or any other political subdivision shall be void."

Section 183 has been a part of the Constitution from the beginning, but the portion of the article preceding it takes the place of § 182 as it originally stood. Prior to the amendment the state was indebted on account of the assumption of territorial indebtedness and other items to the extent of $412,000. The sole question here is the constitutionality of § 1 of House Bill 49, which direct certain officers to issue negotiable bonds of the state in the aggregate amount of $2,000,000. The petitioner contends that it is the ministerial duty of the secretary of state, under the act referred to, to attest the bonds; but the respondent contends that to do so would involve a violation of the Constitution, as amended, in that it would result in the creation of an unsecured bonded indebtedness greater than that authorized by the Constitution.

44 N. D.—35.

The question can only be resolved by a construction of those provisions of the existing Constitution which are above set forth. These provisions constitute the fundamental law of the state on the subject of public indebtedness and they must be so construed that the purpose therein manifested may be subserved and the meaning given effect. The Constitution says that the state may issue or guarantee the payment of bonds provided that all bonds in excess of $2,000,000 shall be secured, etc. Does this language relate in any way to bonds already issued? That is the question. The language of the first clause is both permissive in form and indicative of future acts, and it would seem to be clear that the bonds referred to in the second clause are such as may be issued or guaranteed by the state under the first clause. In other words, it is as though it were stated, "The state may issue or guarantee the payment of bonds, provided that all bonds (so issued or guaranteed) in excess of $2,000,000 shall be secured," etc. Gray, in his work on Limitations of Taxing Power & Public Indebtedness, says that constitutional debt limits are not retrospective in any sense except when expressly made so. § 2156. It would seem to be clear, that the constitutional permission to issue or guarantee unsecured bonds is a permission to be exercised without regard to existing indebtedness unless the intention to qualify the authority by acts done in the past is indicated. Such an intention is not expressed in the Constitution, nor can it be clearly implied from any of its provisions.

The true implication is, in fact, contrary to the respondent's contention. It will be noted that § 183, which limits the debts of municipal subdivisions to 5 per centum upon the assessed value of the taxable property, expressly provides that in estimating the indebtedness "the entire amount of existing indebtedness, whether contracted prior or subsequent to the adoption of this Constitution, shall be included." The absence of any such language in § 182, as amended, rather implies that outstanding indebtedness was not to be considered as embraced within the $2,000,000 unsecured issues authorized.

The reasoning employed by Chief Justice Christianson in his dissenting opinion in the case of State ex rel. Byerly v. State Canvassers, ante, 126, 172 N. W. 105, with reference to the different methods of expressing the requirement of the number of votes necessary to carry

constitutional amendments is directly applicable here. It was there held that an amendment providing for future amendments to the Constitution by the process of initiative, which required a majority of all the votes cast at the general election, showed a purpose to distinguish between the number of votes required for passing such an amendment and the number required for passing an amendment proposed by the legislature as previously expressed in the Constitution, where it was provided that such amendments were passed by the favorable vote of a majority of the electors voting thereon. In other words, it was submitted in that opinion that the failure to reincorporate in the amendment providing for initiatory amendments the express statement originally contained in the Constitution, with respect to the number of votes required to pass amendments submitted by the legislature, indicated an intention to differentiate between the two. This reasoning, persuasive as it is, was not considered by the majority to be applicable to the question then in hand, for the reason that the language employed in the amendment to express the requirement had been repeatedly construed by the court previous to its adoption in the amendment. In the light, however, of the general principle that constitutional limitations upon the power to incur indebtedness are prospective in their operation, and of the further fact that where it is desired to limit authority to incur indebtedness by reducing it to the extent of outstanding indebtedness expressions to that effect are generally employed, the reasoning of the Chief Justice in the case referred to applies with peculiar force to such a situation as is here presented.

Reading §§ 182 and 183 of the Constitution, as it now stands, together, it appears to me that the failure to incorporate in § 182 any language referring to existing indebtedness of the state, such as is found in § 183 with respect to the minor municipalities, taken together with the fact that the language of § 182 is permissive and prospective and, as such, applicable only to future issues and guaranties, I am of the opinion that the authority therein conferred is not reduced by the amount of outstanding indebtedness. I am consequently of the opinion that § 1 of House Bill No. 49 is constitutional and that the writ should issue.

ROBINSON, J. (concurring specially). The purpose of this suit is to mandamus Thomas Hall, as secretary of state, to sign and certify state bonds pursuant to an act providing for the issuing of state bonds in the sum of $2,000,000, to be known as "Bonds of North Dakota, Banking Series." This act was passed with an emergency clause by two-thirds majority of the senate and house of representatives. It was passed pursuant to this amendment:

"The state may issue or guarantee the payment of bonds, provided that all bonds in excess of two million dollars shall be secured by first mortgages upon real estate in amounts not to exceed one half of its actual value, or upon real and personal property of state-owned utilities, enterprises, or industries in amounts not to exceed its value, provided, further, that the state shall not issue or guarantee its bonds upon property of state-owned utilities, enterprises, or industries in excess of ten million dollars."

On this amendment the vote was: Yeas, 46,000; nays, 34,000. On the amendment for public ownership, the yeas were 47,000, nays, 32,000. On the amendment for initiative and referendum the yeas were 50,000 and the nays 31,000. Under those amendments the state is free to issue bonds and to pursue any industry. The bonding amendment is broad and liberal, and not in any way narrow or contracted. It relates wholly to the future, and not to the past. It declares that the state may issue bonds and then it imposes the limitations, which are that all bonds in excess of $2,000,000 shall be secured, the manifest purpose of which was to authorize the several bond issues regardless of any prior indebtedness. In construing a remedial statute, we must consider the old law, the mischief, and the remedy. Under the old law the state was prohibited from engaging in any industry or enterprise, and accordingly the power to contract debts was limited to the small sum of $200,000, but under the new amendment the old limitations and hamperments are no more. Now the state and any county or city may engage in any industry, enterprise, and business. And as no limitations are placed on the manner of doing any business, of course the state may adopt the usual business methods, which include the borrowing of money and the adaptation of means to ends. The amendments which permit and invite the state, which make it the duty

of the state to engage in business and enterprises, must be liberally construed altogether, so as to impose no handicaps on the state. It must be entirely free to adopt every means and method which may be necessary to business success. The state and the several counties and cities are public corporations, with large capital and credit. Thus far they have existed as big nurslings by pursuing the feudal system of levying taxes on the people and then squandering the public money. Now the public corporations are invited to do business and to make their own expenses and a profit for the citizens or stockholders the same as all private corporations do. With all its capital and credit, if the state cannot learn to make its own expenses and a profit for its citizens, it does not deserve to exist. At the next election there should be submitted a constitutional amendment prohibiting all further taxation, except it become necessary for the payment of the bonds. It is high time for the people to throw off the yoke of bondage and feudalism. Hence we conclude that it is the duty of the secretary of state to sign and certify the state bank bonds to the amount of $2,000,000.

CHRISTIANSON, Ch. J. (dissenting). It is the duty of the secretary of state to certify that bonds issued by the state pursuant to law and within the debt limit have been so issued and are within such limit. But it is equally his duty to refrain from so certifying if the certificate would be false. The secretary of state is sworn to support the Constitution. He would violate his oath of office if he certified that bonds sought to be issued in excess of the constitutional debt limit were within such limit. The debt limit of the state was fixed in § 182 of the Constitution. The bonds involved in this proceeding are undisputably in excess of such debt limit, unless that section has been amended. The bonds involved purport to be issued by authority of an amendment to § 182. Such amendment was involved in State ex rel. Twichell v. Hall, ante, 459, 171 N. W. 213, and State ex rel. Byerly v. State Canvassers, ante, 126, 172 N. W. 80. And for the reasons stated in my dissenting opinions in those cases, I believe that § 182 has not been amended and that the debt limit remains as originally fixed therein.